UNITED STATES of America, Appellee,

v.

Anthony PROVENZANO, Stephen Andretta, and Thomas Andretta, Appellants.

Nos. 79–1912, 79–2381, 79–1956, 79–1913 and 79–2387.

United States Court of Appeals, Third Circuit.

Argued March 25, 1980.

Decided May 8, 1980.

Ralph A. Jacobs (argued), Asst. U. S. Atty., Robert J. Del Tufo, U. S. Atty., Newark, N. J., for appellee.

Donald R. Conway (argued), Hackensack, N. J., for appellant Stephen Andretta.

Harvey Weissbard (argued), Isles, Newman & Weissbard, West Orange, N. J., for appellant Anthony Provenzano.

Robert H. Kiernan (argued), New York City, for appellant Thomas Andretta.

Before ROSENN, GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

In these consolidated appeals we are presented with challenges on numerous grounds to the convictions of Anthony Provenzano, Thomas Andretta, and Stephen Andretta under the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962.[1] The defendants[2] were convicted by a jury at a joint trial of conspiracy to violate RICO and of substantive violations, and were sentenced to prison terms and fined.[3] We have determined that the district court made no errors at trial which would warrant reversal, and we therefore affirm the judgment of the district court in all five appeals. In this opinion we will discuss briefly our resolution of the appellants' chief objections to the conduct of their trial.

### I.

The facts of this case, as alleged in the indictment and found by the jury, revolve around a fairly complex labor kickback scenario. The Government's theory[4] is as follows:

1. There are five appeals, as follows. Provenzano appeals his conviction at No. 79–1912 and denial of his new trial motion at No. 79–2381. Thomas Andretta appeals his conviction at No. 79–1913 and denial of his new trial motion at No. 79–2387. Stephen Andretta appeals his conviction at No. 79–1956.

2. A fourth defendant at the joint trial, Gabriel Briguglio, was also convicted, and has appealed as well. Briguglio's appeal, however, was severed and remanded on an unrelated point.

3. Provenzano and Thomas Andretta received 20-year terms; Stephen Andretta was sentenced to 10 years in prison. The former two were denied bail, see United States v. Provenzano, 605 F.2d 85 (3d Cir. 1979); Stephen Andretta is free on bail.

4. Because these are appeals from jury convictions, we must view the facts in a light most favorable to the Government. See, e. g., United States v. Pratt, 429 F.2d 690, 691 (3d Cir. 1970) (motion for acquittal).

5. 29 U.S.C. § 186 provides in relevant part:
 (a) Payment or lending, etc., of money by employer . . . organizations

Provenzano led a group consisting of himself, Thomas Andretta, Stephen Andretta, Gabriel Briguglio, and others, including Ralph Picardo, who was the Government's chief witness at trial. The group's aim was to extort money from trucking companies in return for "labor peace," inasmuch as Provenzano was allegedly able to control the International Brotherhood of Teamsters Union in New Jersey. The target in this case was a trucking company named Interocean Services, Inc. (Interocean), and later a successor company known as Di-Jub Leasing Corporation (Di-Jub). These companies were "in house" truckers for Seatrain Lines, Inc. (Seatrain), a large shipping company which shipped containerized freight that was ultimately trucked to its final destination.

Picardo had once been a truck driver and Teamsters member. Sometime after 1969, at Provenzano's direction, he switched to management and became a trucking manager, so that he could enable Provenzano, a Teamsters Union official, to be paid secretly for influencing union actions, in violation of 29 U.S.C. § 186.[5]

It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of any employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
(1) to any representative of any of his employees who are employed in an industry affecting commerce; or
(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or
(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or

Picardo went to work for Seatrain. In 1969, Seatrain owned Interocean, which in turn owned Switching, Inc. Interocean, under Interstate Commerce Commission authority, did all necessary long-distance trucking for Seatrain; and Switching, not under ICC regulation, moved containers at or near Seatrain's piers. Interocean, many of whose officers had come from Seatrain, was not unionized, while Switching had a Teamsters Union contract.[6]

Sometime thereafter Picardo negotiated the "labor peace" deal with Interocean, specifically with Raymond Rosen, Interocean's vice-president. Picardo, the "front man" now operating a company, Cargo Truck Leasing (Cargo), supplied trucks and owner-operator drivers to Interocean, thus enabling Interocean to avoid unionization and union obligations. In return, Interocean allowed Cargo to collect from Interocean for ghost drivers, i. e., Cargo collected extra money for nonexistent truck drivers who, of course, never performed work. This money was funneled to Picardo and his "associates," as he referred to the appellants at trial.

Among the actions charged by the Government, appellants ensured Picardo's continued dealings with Interocean (though Interocean feared Picardo would hijack its trucks) by threatening labor disruptions, and appellants extorted more money from Interocean in return for preventing the Longshoremen's Union from disputing the Teamsters Union's jurisdiction over movement of trucks within and around Seatrain's pier facilities. To guarantee Cargo's supply of drivers, appellants used their influence at Teamsters Local 560 in Union City, New Jersey, to send drivers to Cargo, where the drivers received low wages and no benefits, instead of sending them to union-organized terminals.

The illegally obtained money was distributed in various ways: checks to fictitious payees, chits, drawings on petty cash, salaries to a no-show worker, and fees for upkeep of horses of some of appellants' relatives. It was distributed either at a bar or at Local 560 in four shares: one-quarter to Provenzano and his brothers; one-quarter to Briguglio and his brothers; one-quarter to Thomas Andretta and Armand Faugno, who cashed checks; and one-quarter to Picardo. When Faugno "disappeared" in 1972, Stephen Andretta took his place and collected the monies previously paid to Faugno.

Overt links with Provenzano occurred in 1972 or 1973, when Picardo told him the details of the scheme and Provenzano complimented Picardo on it (A1072–73), and when Picardo personally delivered cash to

duties as a representative of employees or as such officer or employee of such labor organization.
(b) Request, demand, etc., for money or other thing of value
(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.
(2) It shall be unlawful for any labor organization, or for any person acting as an officer, agent, representative, or employee of such labor organization, to demand or accept from the operator of any motor vehicle (as defined in part II of the Interstate Commerce Act [49 U.S.C. 301 et seq.]) employed in the transportation of property in commerce, or the employer of any such operator, any money or other thing of value payable to such organization or to an officer, agent, representative or employee thereof as a fee or charge for the unloading, or in connection with the unloading, of the cargo of such vehicle: *Provided,* That nothing in this paragraph shall be construed to make unlawful any payment by an employer to any of his employees as compensation for their services as employees.

6. The Government alleges that it was only through the appellants' influence that Interocean remained non-unionized, and that the purpose of Switching's union contract was twofold: to supply Picardo and another cohort with union pension and welfare benefits and to give Interocean sham evidence of unionization to dissipate suspicion. The Government also claims that Switching violated its union agreement by avoiding union fund contributions through the use of non-union owner-operators and that Stephen Andretta arranged a sham audit on behalf of the pension fund. Appellants dispute these allegations.

Provenzano in August 1974 (A1073–74, A1297, A1323–37).

The group next acquired control of Lift-Van Transport, a certified common carrier, and attempted to phase out Interocean and replace it with Lift-Van. Through appellants' influence, Lift-Van was able to refuse to renew its union contract and fire all union employees. When Picardo, Lift-Van's front man, was jailed for murder in 1975, his cohorts persuaded him to sell Lift-Van.

Appellants later set up the FLT Corporation to replace Cargo. Thomas Andretta, who ostensibly ran FLT, was in prison at all relevant times.

The dispatchers of Interocean who knew of the ghosting scheme were paid to add the names of the "ghosts" and to keep quiet.[7] When an Interocean auditor discovered a salary being paid to a no-show employee, he was told by Rosen and the employee it was not his business. When the auditor discovered the ghosting scheme, Rosen told him the false billings were just overcharges, which Cargo would be asked to repay. The scheme was uncovered when Picardo agreed to cooperate with the Government.

II.

These appeals present fifteen issues, some of which are raised by all appellants, and some of which affect only one of the three.

A. *Issues Common to All Appellants*

1. *RICO or Larceny?*

■ Appellants assert that there was a variance between the indictment and the proofs at trial, *i. e.* that the indictment charged a RICO violation, while the proof showed only larceny. A RICO violation required proof that Interocean, or later Di-Jub, bribed members of appellants' group in order to secure labor peace. These bribes constitute the racketeering required by the RICO Act, 18 U.S.C. § 1962,[8] because these debts are unlawful under 29 U.S.C. § 186. Proof of bribery requires knowledge on the part of the party giving the bribe. The appellants contend that the Government failed to prove that anyone at Interocean or Di-Jub knew of Picardo's and Cargo's ghosting scheme, and therefore at best the Government proved that Picardo, who asserted that he was getting money to provide labor peace, was actually just stealing from Interocean.

Appellants point to testimony of Rosen, Interocean's vice-president, to the effect that he did not know of Picardo's ghosting

7. Appellants allege that the payments were made to keep them from telling Seatrain or higher Interocean officials.

8. 18 U.S.C. § 1962 provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in

any pattern of racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

operations (A2217, A2295).[9] In addition, two Interocean dispatchers testified to receiving bribes from Picardo; only one, however, said that he suspected that the purpose for the bribe was that he conceal the ghosting from his Interocean superiors (A1883). The auditor who discovered the ghosting testified that Rosen told him Cargo would have to pay back the overcharges and that in fact Cargo did pay them back (A1945).

On the other hand, Picardo testified to conversations with Rosen, during which he claimed to have discussed the specifics of the scheme with Rosen (A1004, A1029, A1039–40). Picardo also testified that the payments were made (A1052). In addition, Rosen's telling the auditor that the discrepancies were none of his business (A1935–36) and a memorandum revealing that Interocean had to guarantee money for labor peace (A2117–18) both support the Government's theory. With respect to the bribes paid by Picardo to the dispatchers, Alan Abramowitz, an employee of Picardo at Cargo, testified that he never told anyone the money had been paid to keep the dispatchers quiet, but he then admitted, upon being confronted with a writing, that he had once told an FBI agent that he believed that the monies had been paid for this purpose (A1853). He never specified from whom the secret was to be kept. Both dispatchers testified they were paid to add the "ghosts" to the list (A1863, A1881). Only one ambivalently suggested that he was paid not to tell his superiors (A1883). In any event, even if Rosen knew of the scheme, Picardo could reasonably have bribed the dispatchers to keep quiet and not spread the word to anyone, so as to conceal from them Rosen's knowledge and thereby avoid the dispatchers' knowing of and revealing the extent of the scheme.

The jury apparently believed Picardo's testimony that he had informed Rosen of the scheme and that Rosen, on behalf of Interocean, bribed Picardo's group, thus involving the group in a RICO violation. Under the applicable standard of review, *see, e. g., United States v. Hamilton*, 457 F.2d 95, 98–99 (3d Cir. 1972), this jury verdict of guilty must stand because there was sufficient evidence for the jury to find beyond a reasonable doubt that Rosen had knowledge of the scheme and bribed Picardo's group. Thus, there was properly proved a valid RICO-type violation, as opposed to mere grand larceny.

### 2. *"Enterprise"*

■ Appellants acknowledge that the prevailing statutory interpretation in most of the Circuits brings them and their association within the meaning of the RICO statute's requirement of an "enterprise," as defined in 18 U.S.C. § 1961(4):

"[E]nterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity . . . .

Yet appellants argue that their association is not an "enterprise" because it had no legitimate purpose. They argue that the legislative history of RICO indicates a desire to prevent infiltration of legitimate business, and therefore all offenses—like those alleged here—not involving a legitimate business should be prosecuted under other pre-existing criminal laws. Otherwise, they argue, the complex RICO statute would have been unnecessary.

Five Circuits have rejected this argument and have concluded that even an association formed for the sole purpose of illegal racketeering can satisfy the "enterprise" requirement. *E. g., United States v. Rone*, 598 F.2d 564 (9th Cir. 1979); *United States v. Swiderski*, 593 F.2d 1246 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S.

---

**9.** The only ghosting to which Rosen admitted of being aware was a separate scheme whereby Interocean overcharged Seatrain to make up deficits incurred by undercharging customers, thereby enabling Seatrain indirectly to grant illegal rebates to those customers.

1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). Only the Sixth Circuit, in a divided panel opinion later vacated for rehearing en banc, has suggested it would follow appellants' theory. *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), *vacated and rehearing en banc granted*, Nos. 78–5134 to –5139, –5141, –5143 (6th Cir. Nov. 7, 1979) (rehearing held Apr. 2, 1980).

We have previously held that RICO is to be construed liberally. *United States v. Forsythe*, 560 F.2d 1127, 1135–36 (3d Cir. 1977). And in *United States v. Frumento*, 563 F.2d 1083, 1089–92 (3d Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), this court held that the word "enterprise" was broader than a private business or a union, and included a state agency. But we need not go so far as to adopt generally either the narrow or the broad definition of "enterprise" in this case. The purpose of RICO—prevention of infiltration of legitimate business by racketeers—would in any event be vindicated by the convictions here, since the wholly illegitimate Provenzano association subverted legitimate unions and businesses, although the Government did not allege that any union local was the "enterprise" (A3854—jury charge). We decline in this case to construe the RICO statute so as to allow the appellants a defense that they made sure *not* to engage in any *legal* activity.

### 3. *Picardo's Testimony About Use of Fear and Intimidation*

Appellants assert that their convictions must be reversed because the jury heard

Picardo testify to other wrongs that the appellants committed, specifically loan-sharking and gambling (A958); to appellants' use of fear and intimidation (A1000); to their threatening Picardo should he fail to deliver on his obligations (A1090); to their fixing of horse races (A1114); and to their threatening to kill Picardo in jail (A1759). The district court admonished Picardo against testifying about appellants' other wrongs, and twice even the Government was surprised by Picardo's responses (A966—loan-sharking and gambling; A1115 —fixing of horse races), and disclaimed any attempt to prove them.

■ Of course, evidence of such alleged criminal activity is not admissible to prove that the appellants were guilty of the crimes charged. Fed.R.Evid. 404(b). Nevertheless, evidence of other crimes is admissible for other purposes, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," *id*. Although the Government never attempted to justify introduction of appellants' other wrongs on any of these grounds when appellants objected, and the district court did not explain its reasons for admitting the testimony, such a specification is not necessary, as long as the statements were in fact admissible. *See United States v. Rosenstein*, 474 F.2d 705, 711–13 (2d Cir. 1973) (appellate court may affirm admission of evidence on ground never urged or decided in trial court, as long as evidence is admissible under ground relied on by appellate court for same purpose for which it was admitted by trial court); [10] *cf. PAAC v. Rizzo*, 502 F.2d

---

10. Thus, in *Rosenstein*, the Second Circuit affirmed the admission of evidence on the basis of the nonhearsay character of statements of coconspirators in furtherance of the conspiracy, while the trial court had erroneously relied on the business records exception to the hearsay rule. Both grounds allowed introduction of the evidence for the same purpose—to establish the truth of what it said—without different or limiting instructions to the jury. *Rosenstein* distinguished *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), and *United States v. DeMasi*, 445 F.2d 251 (2d Cir.),

*cert. denied*, 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971), as cases where erroneous plenary admission of hearsay could not be justified by the more limited theory of proof of the declarant's state of mind. *See* 474 F.2d at 710–11. In the present case, whether Picardo's testimony was admissible as being directly relevant or was admissible to prove such things as plan or opportunity of the Provenzano group to control the scheme, it was admissible for the same purpose, *i. e.*, to prove the truth of what it said. Thus, under *Rosenstein*, the rule 404(b)

306, 308 & n.1 (3d Cir. 1974) (appellate court may affirm correct decision on ground not relied upon by district court), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

Evidence of the use or intended use of fear and intimidation to control the piers (A1000) was relevant to show both the opportunity to carry out the scheme and the plan of how to carry out the scheme. Picardo's testimony as to his fears of reprisals by the others should he fail to come up with the money (A1090) was relevant to show both knowledge of the others and how the others controlled Picardo's role (plan), as opposed to the defense theory that the entire operation was merely a larceny of Picardo's own doing. Evidence of the death threat Stephen Andretta made to Picardo while Picardo was incarcerated (A1758–59) was relevant to show how the others controlled Picardo's role (plan), to the extent that they forced him to sell Lift-Van when he, being incarcerated, could no longer operate it. Moreover, defense counsel had already elicited from Picardo on cross-examination that he was angry during his incarceration at Stephen Andretta (for reasons defense counsel would not let Picardo explain) (A1611–13), and that Picardo had already told an FBI agent that Stephen Andretta had made (unspecified) threats to him (A1669). Defense counsel had thus cast doubts on Picardo's credibility, and evidence of the reason for his anger at Stephen—*i. e.*, a one-time death threat should Picardo not follow orders—was independently relevant to rebut or explain Picardo's motive to lie against his associates, as might be suggested by a general anger at their not helping him out of jail over a long period. Finally, defense counsel had already elicited the fact that Stephen Andretta had threatened Picardo in some way; so the elucidation of the precise nature of the threat was, on balance, not prejudicial.[11]

Some of Picardo's answers, however, *i. e.*, those relating first to loan-sharking and gambling, and second to the fixing of horse races, were clearly irrelevant for any purpose. When Picardo gave these answers, the court promptly told the jury to disregard the testimony (A958–59, A1119). Moreover, in the charge to the jury, the district court again stated that they must disregard questions and answers, objections to which were sustained (A3799–800), as well as remarks that the court had stricken (A3800). In each instance, the prosecutor claimed that he had not expected such answers, and that he had told Picardo to avoid inserting extraneous matters (A966, A1114–16). Both responses came after questions that were designed to elicit other information.

As to the first, the Assistant United States Attorney asked Picardo to identify the types of businesses in which the association, Picardo and the appellants, engaged, expecting Picardo to reply that only trucking was involved. Instead, Picardo answered, "Trucking, loan-sharking, gambling" (A958). As to the second, Picardo had previously testified that "North Jersey Feed Company was for the purpose of getting into the race track and to be able to tranquilize horses and fix races" (A1114). The Assistant United States Attorney then asked whether Picardo had involved his associates with that business, expecting Picardo to explain that his "associates" were *not* involved, and that, on the contrary, it was Picardo's way to siphon money secretly from them (A1114–15). Instead, Picardo answered that he had involved his associates with North Jersey Feed Company (A1114).

Under these circumstances, we cannot say that the unsolicited references to loan-

---

ground might validly support the admission of Picardo's testimony.

**11.** Fed.R.Evid. 403, requiring exclusion of evidence the district court finds to be more unfairly prejudicial than it is probative, apparently never was invoked at trial. We will therefore presume that the district court performed the appropriate balancing, *United States v. Long*, 574 F.2d 761, 766 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). As the analysis above illustrates, the district court's decision to admit the testimony was not an abuse of discretion.

sharking, gambling, and the fixing of horse races were so inflammatory or prejudicial that they could not be cured by jury instructions, which, as noted, were given. We therefore conclude that defendants were not prejudiced. Nor do we think that this case falls within the rule of *Government of Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir. 1976), requiring reversal despite the district court's striking of the testimony. The testimony here was not of other convictions, but rather consisted of an offhand mention that the appellants were also involved peripherally in other common illegal activities. Given the long and complex descriptions of the RICO violations, we are satisfied that the casual mention of others did not constitute reversible error.

### 4. *Picardo's Unsolicited Comments*

Picardo defied the district court's warnings and conversed with marshals while sidebars were being held in another room. Although these conversations took place within sight of the jury, they did not take place within the jurors' hearing. The jurors all denied hearing anything, except for one alternate juror (who ended up being dismissed with the others at the end of the summations), who "heard him [Picardo] say something about somebody's wife" (A974). We cannot say that this conduct, albeit in disregard of the district court's ruling, requires reversal.

### 5. *Pretrial Publicity*

Appellants claim that certain jurors were impaneled when they should have been removed for cause for lack of impartiality. The crux of the problem was pretrial publicity about Provenzano. The appellants argue that either many veniremen should have been excused for cause, or jurors should have been chosen from a different vicinage, or Provenzano's trial should have been severed.[12] Appellants claim prejudice

in two ways: first, that biased jurors decided the case, and, second, that appellants were prejudiced by the failure of the district court to excuse other veniremen for cause, forcing appellants to waste peremptory challenges to excuse them, *see United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976); *cf. Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965) (denial or impairment of right to use peremptory challenges, once given, is reversible error).

The constitutional standard for dismissal of veniremen was set forth in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Pretrial publicity exposure will not automatically taint a juror. Even if the juror has heard of or about the case and of the allegations of a defendant's guilt, he may sit if he is still capable of abandoning his prior impressions and rendering a fair verdict on the evidence. A juror's own assurance of this is not the final determinant, but the accused has the burden of proof to demonstrate that the juror is partial. *See id.* at 799–800, 95 S.Ct. at 2035–2036. Prejudice is to be presumed only in cases where "the influence of the news media . . . pervaded the proceedings," *id.* at 799, 95 S.Ct. at 2035. Examples the Court gave include a trial where pretrial publicity consisted of showing a twenty-minute confession three times on television, *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and a trial where cumbersome television equipment invaded the courtroom, *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).[13]

But in the *federal* courts, *Murphy* affirms that the stricter rule of *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam), and *United States ex rel. Doggett v. Yeager*, 472 F.2d 229 (3d Cir. 1973),[14] still governs, as a

---

12. The last alternative would have satisfied Thomas and Stephen Andretta but not Provenzano.

13. *Cf. Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (key prosecu-

tion witnesses acting as juror attendants throughout trial).

14. In *Marshall*, the Court reversed the defendant's conviction where seven jurors had seen one or both of two newspaper articles describ-

matter of supervisory authority. In federal cases, therefore, jurors are to be dismissed on less of a showing of actual prejudice than that required by *Murphy*.

 We have examined the record and have conducted an independent review of the circumstances alleged to constitute pretrial publicity in this case. *See United States v. D'Andrea*, 495 F.2d 1170, 1172 n.5 (3d Cir.), *cert. denied*, 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). We have concluded, first, that the publicity in this case was not presumptively prejudicial as a matter of law, in contrast to that involved in cases like *Rideau*, and, second, that the "substantial prejudice" required by *D'Andrea* has not been demonstrated. Most of the pretrial knowledge in the present case consisted either of reports that the jury would be selected that day or of a panel member's having heard mere mention in the news of such terms as "Mafia," "unions," "gangster," "Tony Pro" (Provenzano's nickname), "organized crime," or "kickbacks" in connection with the case. No panel member indicated any·belief in this type of generalized innuendo, and each as-

sured the district judge in response to a series of five to ten searching questions that he or she would decide the case strictly on the evidence and on the law as explained by the judge and would not be influenced by publicity. In light of the record in this case, the district court did not err in not excusing certain challenged veniremen for cause.[15]

### 6. Juror Misconduct

The jury in this case was sequestered. Toward the end of the trial, at about 3:00 a. m., a marshal discovered a juror and two alternate jurors smoking marijuana, and reported the incident to the district judge, who informed counsel. The district court suggested that no action be taken; defense counsel, after conferring among themselves, agreed but suggested in addition that the district judge tell the offenders not to be concerned about the incident, and that they would not be prosecuted. The district judge did as counsel requested. None of the appellants were personally present at the conference when counsel were informed of the incident; in fact none found out about it until after trial.

ing how the defendant, on trial for unlawful distribution of prescription drugs, had previously practiced law without a license, even though the jurors averred that they would not be and had not been influenced by the articles. In *Doggett* the publicity occurred during trial and consisted of newspaper items indicating that Doggett had retracted a guilty plea and had attempted to escape. The court described the case:

The record discloses that the trial court did admonish the jurors not to read or pay attention to anything about the case appearing in the newspapers. It also discloses that despite this admonition some jurors, at least, certainly disregarded it.

Thus, we have before us a case in which prior to the commencement of a trial, counsel, anticipating adverse newspaper accounts, requested an adjournment; where during the trial highly prejudicial newspaper accounts did in fact circulate in the small community in which the trial was being held; where it was established that at least two of the unsequestered jurors had read the highly prejudicial newspaper accounts despite an admonition not to do so; where an examination as to whether others had also disregarded the admonition was made *en banc* rather than individually; where no inquiry was made as to whether the two jurors who con-

cededly read the prejudicial newspaper accounts discussed them with others; where an additional page one prejudicial newspaper account circulated in the same small community in the vicinity of the unsequestered jury; where the court would not even permit inquiry respecting exposure of the jurors to the later newspaper account although the jurors had access to the newspaper in question; and where the defendant's position was at all times after the first newspaper account appeared urged upon the court by timely motions for a mistrial and a continuance. 472 F.2d 233–34. *Doggett* involved review of a state trial but this court at that time applied the *Marshall* standard to state cases as well. This was rejected in *Murphy*, *see* 421 U.S. at 797, 95 S.Ct. at 2034.

15. In addition, as to some veniremen, objections were waived by failure to challenge for cause. *See, e. g., United States v. Cepeda Penes*, 577 F.2d 754, 759 (1st Cir. 1978); *United States v. Hawkins*, 566 F.2d 1006, 1013 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978); *cf. Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973) (waiver of objection to composition of grand jury).

Appellants now challenge the course of conduct chosen by the district court, claiming that he should have dismissed the offenders *sua sponte* without soliciting or accepting counsel's advice. We disagree. We see no reason to depart from the longstanding rule that counsel's intentional tactical decisions at trial bind his client. For the same reason, the district court did not err in denying appellants' motion for a new trial on the ground of untimeliness, since counsel, even if not appellants, knew of the incident before, so it was not newly discovered evidence, and the motion was not made within seven days after trial. Under *United States v. Bujese*, 371 F.2d 120, 125 (3d Cir. 1967), "evidence is not 'newly discovered' when it was known or could have been known by the diligence of the defendant or his counsel."

Even if we were convinced that appellants had not waived objection to the district court's failure to excuse the offending jurors, we do not think that the smoking of marijuana by one juror and two alternates warrants reversal in the instant circumstances. While possession of marijuana is illegal under both federal and state law, 21 U.S.C. § 844; N.J.Stat.Ann. § 24:21–20, since none of the offending jurors were ever charged or convicted, they would not be disqualified from service under 28 U.S.C. § 1865(b)(5).[16] And without engaging in extended philosophical discussion of where we might draw a line in a proper case, we hold as well that the public knowledge that sitting jurors were smoking marijuana does not create such an appearance of impropriety as to warrant reversal of convictions where the jurors were not dismissed. Nor is there any serious contention that the drug's intoxicating effect affected the jurors' ability to hear evidence or to deliberate. No one suggested this to be

the case the following day at trial, and the district judge later observed, when denying the new trial motion, that the jurors had not been "in any way impaired from functioning as such" (Joint Supp.App. at SA58–59). The modern view is that the consumption of alcohol is not prejudicial as a matter of law, *see, e. g., Kealoha v. Tanaka*, 45 Hawaii 457, 470–74, 370 P.2d 468, 475–77 (1962), and appellants have not demonstrated prejudice, as required by cases such as *United States v. Taliaferro*, 558 F.2d 724, 726 (4th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 734, 54 L.Ed.2d 761 (1978), and *United States v. Klee*, 494 F.2d 394, 395–96 (9th Cir.) (premature discussion of case among jurors), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974).

Finally, we reject as sheer speculation appellants' contention that the jurors, who were told not to worry about prosecution, must thereby have felt indebted to the Government and accordingly felt compelled to vote to convict out of fear of retaliation by the Government. Moreover, it was defense counsel who insisted on the judge's assuring the jurors that they would not be prosecuted *lest* they favor the Government out of fear of prosecution (Joint Supp.App. at SA117–18).

### 7. *Absence of Appellants at Conference Discussing Incident*

Appellants claim that their rights were prejudiced by their not being included in the conference regarding marijuana smoking by jurors. They now claim they would have influenced counsel to ask for disqualification of the jurors.

It is clear that there is no *constitutional* right for a defendant to be present at a conference in chambers concerning dis-

---

16. 28 U.S.C. § 1865 describes the method of juror selection and qualification. Subsection (b)(5) provides:

> (b) In making such determination the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—

\*　\*　\*　\*　\*　\*

> (5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

missal of a juror. *See United States v. Brown*, 571 F.2d 980, 986–87 (6th Cir. 1978); *United States v. Howell*, 514 F.2d 710, 714 (5th Cir.), *cert. denied*, 423 U.S. 914, 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); *United States v. Baca*, 494 F.2d 424, 428–29 (10th Cir. 1974); *Ellis v. Oklahoma*, 430 F.2d 1352, 1354–56 (10th Cir. 1970) (habeas corpus motion following state trial), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971). What remains is a question of the interpretation of Fed.R. Crim.P. 43. Subdivision (a) states:

> The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

On the other hand, subdivision (c)(3) provides:

> A defendant need not be present . . [a]t a conference or argument upon a question of law.

We hold that reversal in this case is not required by rule 43 for three reasons. First, any objection to appellants' nonpresence at the conference was waived by counsel's failure to object contemporaneously. *See United States v. Brown*, 571 F.2d at 987.[17] Second, despite the holdings of that case and *United States v. Baca, supra*, we believe that the district court correctly held that under rule 43(c)(3) the appellants had no right to be present at the conference. The facts were undisputed, and the conference concerned only a question of law: whether, on the facts, dismissal of the offenders was compelled. We have already held that the district court had discretion to retain or dismiss the jurors. In the exercise of that discretion, he left this decision up to the defense counsel. Counsel themselves made the tactical choice to place their clients' fate in the hands of the jury which included one of the offending jurors, rather than in the hands of the particular alternate who would be called as a replacement.[18]

Third, even if rule 43(a) required appellants' presence at this stage of the trial, *see, e. g., United States v. Brown*, 571 F.2d at 986, this rule is subject to the harmless error doctrine, *see id.* at 987. Examination of the record reveals that counsel vigorously safeguarded appellants' interests, to the extent of insisting on procedures they—counsel—thought would yield the best chance for acquittal. It is fanciful for appellants to suggest *post hoc* that they would have demanded replacement of the offending juror had they been present at the conference. Therefore, any error in the district court's failure to dismiss the offenders *sua sponte* was harmless beyond a reasonable doubt and as such will not warrant reversal.

### 8. *Jury Charge*

The appellants contend that the jury charge was erroneous insofar as it allowed the jury to convict them under RICO so long as the payee or recipient of the illegal payment was a member of the conspiracy, even if the payee or recipient was not a union agent, officer, or employee. We do not agree. A reading of the relevant portion of the jury charge as a whole (A3933–35) clearly shows that the district court correctly instructed the jury that the payee or recipient must be *both* a union agent, officer, or employee, *and* at that time a member of the conspiracy, indicted or unindicted.

### 9. *Testimony Read Back to Jury*

During their deliberations, the jury requested that some testimony be reread to them. The district court reread the direct

---

**17.** In *United States v. Brown*, at least one defendant was present at the conference and knew of the problem. Counsel in the present case did not inform appellants of the conference until after trial, although nothing prohibited them from doing so (Joint Supp.App. at SA113–14, SA119). We do not think that this changes the analysis significantly.

**18.** The alternate who would replace the dismissed juror was identified and known to defense counsel (Joint Supp.App. at SA41, SA81–82, SA101).

testimony of one witness and was about to go on to the testimony of the next witness when defense counsel reminded him to include the first witness' cross-examination (A3894). The judge immediately corrected his oversight, and no objection was made by counsel. Appellants' claim now that this constituted plain error is clearly frivolous.

In addition, appellants point out that some requested testimony was never read back to the jury. This, as well, was not an abuse of discretion. Only after the rereading had apparently been concluded and the jury had again been excused did defense counsel claim that two additional questions and answers were within the jury's request (A3991–92); no objection had previously been made to the portions selected for rereading. Moreover, the district court properly recognized that the two questions and answers were merely cumulative of other testimony of the same witness that had been read back. Therefore, there was no error in the refusal to recall the jury for a rereading of two more questions and answers.

### B. *Provenzano Issues*

#### 1. *Evidence of Provenzano's Participation in the Conspiracy*

■ The evidence of Provenzano's participation in the conspiracy must be considered in the light most favorable to the Government on review of the jury's guilty verdict. *E. g., United States v. Schoenhut*, 576 F.2d 1010, 1014 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978); *United States v. Pratt*, 429 F.2d 690, 691 (3d Cir. 1970). Similarly, the evidence must be so viewed in reviewing the district judge's determination (A3344–47) of proof of Provenzano's participation by a preponderance of evidence independent of coconspirator statements, *e. g., United States v. Trotter*, 529 F.2d 806, 811–12 (3d Cir. 1976); *United States v. Bey*, 437 F.2d 188, 191 (3d Cir. 1971), upon which was predicated the admission of coconspirators' statements, under Fed.R.Evid. 801(d)(2)(E). *See, e. g., United States v. Trowery*, 542 F.2d 623, 626–27 (3d Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). The necessary quantum of evidence has been characterized as "some," *Schoenhut*, 576 F.2d at 1027, and "slight," *United States v. Fried*, 576 F.2d 787, 793 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). What must be shown is Provenzano's *participation* in the conspiracy, *i. e. agreement*, as opposed to mere knowledge thereof or approval, but from a showing of knowledge plus actions taken in furtherance of the conspiracy, the jury may infer the necessary agreement. *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975).

The only direct proof of Provenzano's participation in the conspiracy came from Picardo's testimony. Provenzano attempts to dismiss Picardo as a biased liar, Provenzano brief at 30, but, of course, Picardo's statements must be accepted as true for the purpose of determining the sufficiency of evidence.

Picardo testified that he told Provenzano exactly how the operation was running, that Provenzano approved, and that Provenzano was paid from that operation:

Q. [MR. SPEISER, Assistant U.S. Attorney]. Now, did you ever have a personal conversation with Mr. Provenzano about this operation you were running with Interocean?

A. [PICARDO]. Yes, I did.

Q. What did you tell him?

A. I told him exactly what we were doing, the method we were using, and he complimented me on the successful type of operation.

MR. GOLDBERG [Provenzano Counsel]: Judge, can I have a date?. Is that '73?

THE COURT: What date was it?

THE WITNESS: I don't know the exact date, your Honor.

MR. GOLDBERG: The month?

THE COURT: Do you know the year?

THE WITNESS: I would say '73.

MR. GOLDBERG: Thank you.

THE WITNESS: Or late '72.

Q. Did you ever personally give Mr. Tony Provenzano any of the proceeds of this ghosting operation?

A. I think in one occasion I did personally.

Q. Do you recall when that was?

A. Could you give me a minute to think about that one?

Q. Yes.

A. Sometime in 1973.

(A1072–73). Picardo also testified just before this colloquy that Provenzano received a share (A1072), and received cash proceeds, either directly or through others (A1090). *See Direct Sales Co. v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943) (stake in venture relevant to participation in conspiracy). Picardo testified that Provenzano contributed capital to Lift Van, part of the operation of which was illegal, and that the illegal intent— "[t]o monopolize the industry, not to have a union contract so we could give suppressed rates and get all the lucrative business from the major steamship lines"—was discussed with his "associates" (A1176–77). Picardo testified that Provenzano was interested in the status of Lift Van and was "the boss" who decided that Picardo should acquire Lift Van (A1155–57).

▆ From the above evidence, the district judge could have concluded by a preponderance, and the jury could have found beyond a reasonable doubt, that Provenzano knew of the scheme, contributed money to it, approved of it, and therefore was a participant. Provenzano argues that not all of Picardo's Cargo and Lift-Van operations were totally illegal,[19] so that Provenzano's approval and participation in contributions and profits may have gone to the legal aspects. This may be so, but the judge and jury were entitled to draw the opposite inference, particularly since the thrust of Picardo's testimony was that Provenzano's participation and interest were with respect to the illegal aspects of the operation, i. e., "ghosting."

Picardo also testified that he used illegal profits at Provenzano's direction to pay bills for the upkeep of Provenzano's daughter's

riding horse (A1120–23). Provenzano argues that this is proof only of association and not participation, but the judge and the jury were entitled to infer that Provenzano was doing something to aid the conspiracy, or at the least, he was a part of it so as to entitle him to profit from it.

Although the evidence is not overwhelming, and while it comes from only one witness whose veracity was certainly open to question, it was sufficient to establish a conspiracy and to tie Provenzano to that conspiracy.

2. *Admission of Picardo's Statements Under the Coconspirator Hearsay Exception*

▆ At issue here is the testimony of Paulette Compton and Mary Ann Hart, Picardo's paramours, and of Alan Abramowitz, an employee of Picardo, who were allowed, over objections, to testify to statements Picardo made to them about Provenzano and his role in the illegal operations. The statements were admitted under Fed.R. Evid. 801(d)(2)(E):

(d) *Statements which are not hearsay.*—A statement is not hearsay if—

\* \* \* \* \* \*

(2) *Admission by party-opponent.*—The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Provenzano argues that Picardo's statements as related by Compton, Hart, and Abramowitz were not made in furtherance of the conspiracy, even assuming the existence of a conspiracy which included Picardo and Provenzano. Specifically, Provenzano objects to Compton's testimony about Picardo's telling of Provenzano's role in his, Picardo's, affairs, the claim that FLT was a sham, and how Lift-Van was capitalized (A2460–71), and to Hart's statements about Picardo's high regard for Provenzano (A2635), how Lift-Van was financed

---

**19.** We note that this line of argument conflicts with the appellants' contention that their operations could not be a RICO "enterprise" be-

cause they were wholly illegitimate, *see ante* at 992–993.

(A2642), and how Picardo traveled to Florida on Provenzano's orders (A2648).

Provenzano admits that when Picardo went to jail in 1975, Picardo had Compton run the business for him. Provenzano also admits that both Hart and Abramowitz worked for the business. The district court was entitled to decide that what Picardo told Compton was in furtherance of the conspiracy because he knew he would need someone to run the company if he went to jail. As Compton testified, Picardo gave her a power of attorney when he went to jail because "I [Compton] had been running the office, basically, while he was on trial and he had no one else to take care of the business and I just took over" (A2475). If Compton were to run the business, she had to know all the details, and therefore, Picardo's telling her the sordid details was in furtherance of the conspiracy. While the admissibility of Compton's testimony is a close question, we will not disturb the district court's finding that the statements of Picardo were in furtherance of the conspiracy. *See United States v. Trotter*, 529 F.2d 806, 813 (3d Cir. 1976) (approving a broad construction of the "in furtherance of" requirement).

■ No findings, however, apparently were made with respect to whether the statements of Picardo to which Hart and Abramowitz testified were "in furtherance of" the conspiracy. The district court said only, "I don't understand the objection. If Mr. Picardo is saying things that purportedly refer to the conspiracy, to his employees, then it's an act of a co-conspirator" (A2335–36). This misconstrues the "in furtherance of" requirement. Only if there was a reason for Hart or Abramowitz to know these things about the conspiracy could the statements have been "in furtherance of" the conspiracy. At best, Hart and Abramowitz were Picardo's errand runners. The district court made no findings, and the Government has pointed to no evidence indicating that anything Picardo told them could have furthered the conspiracy.

■ Nevertheless, the testimony was admissible to rebut a claim of recent fabrication under Fed.R.Evid. 801(d)(1)(B):

> (d) *Statements which are not hearsay.* —A statement is not hearsay if—
>
> (1) *Prior statement by witness.*—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . . .

Thus, the statements of Picardo to Compton, Hart, and Abramowitz were consistent with Picardo's statements at trial, where he was available for cross-examination, and are relevant to rebut the defense claim— express or implied—that Picardo was lying against all the defendants in return for benefits from the Government. Evidence was before the jury with respect to Picardo's 1975 murder conviction (A1216–18), as well as the fact that Picardo was in prison (*id.*), and the fact that Picardo was released from the state prison with the aid of the federal government in return for his cooperation in the Provenzano case (A1224–30, A1505–06),[20] and has since escaped from a federal prison but has never been prosecuted (A3479–83, A3489).

Under these circumstances, the testimony of Compton, Hart, and Abramowitz—that *prior to his 1975 murder conviction*, Picardo told them about his association with Provenzano and about the illegalities of the business—was highly probative to rebut the defense claim, which at least was implied, that Picardo fabricated the whole conspiracy so as to remove himself from prison and take revenge on the appellants, particularly Stephen Andretta, for failing to help him out. *See, e. g., United States v. Knuckles*, 581 F.2d 305, 313–14 (2d Cir. 1978) (recordings, in furtherance of conspiracy, also admissible to rebut charge of falsification,

---

**20.** Some evidence of Picardo's deal with the federal government was introduced on crossexamination, by Provenzano's lawyer, who raised the issue of Picardo's bias or motive (A1506–07).

since they predated the suggested motive for falsification—*i. e.* to gain favor with prosecution), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Allen,* 579 F.2d 531, 532–33 (9th Cir.) (Government may rebut implied charge of recent fabrication even where such charge is suggested by evidence introduced by Government for another purpose, as long as Government did not introduce suggestion of falsification merely to enable it to bolster case with prior consistent statement), *cert. denied,* 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d 329 (1978).

■ The testimony of Compton, Hart, and Abramowitz was admissible, at least to rebut a fabrication claim, and the district court's evidentiary ruling may be affirmed on this alternative ground. *See, e. g., United States v. Rosenstein,* 474 F.2d 705, 711–13 (2d Cir. 1973) (affirmance of admissibility on appeal based on coconspirator rule, never discussed by trial court).[21]

### 3. *Admissibility of Provenzano's Prior Convictions*

Provenzano has previously been convicted of murder; of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, *see United States v. Provenzano,* 334 F.2d 678 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); and of conspiracy involving kickbacks in violation of 18 U.S.C. § 1954, a conviction currently on appeal before the Second Circuit.

■ Provenzano desired to testify on his own behalf and therefore moved *in limine* for a ruling as to whether these prior convictions would be admissible to impeach him under Fed.R.Evid. 609:

(a) *General rule.*—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a

crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

\* \* \* \* \* \*

(e) *Pendency of appeal.*—The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible.

The district court excluded the murder conviction, but ruled that the other two convictions would be admissible should Provenzano testify. Consequently, Provenzano declined to testify.[22]

Provenzano argues that the district court erred by applying only rule 609(a)(2), without employing the balancing test of subdivision (a)(1), to the crimes of extortion and of conspiracy in a kickback scheme, both of which Provenzano claims do not "involve [ ] dishonesty or false statement," as required under subdivision (a)(2). The Government, on the other hand, argues, first, that the district court applied the balancing test of subdivision (a)(1), and, second, that the two convictions fall under subdivision (a)(2) in any event.

The district judge said three things about the two convictions he ruled admissible. First:

I would say this: That under 609(a)(2) since the extortion of the Dorn Transportation Company, the Hobbs Act conviction, in my opinion, involved dishonesty, I would have to allow it since it's within a

---

**21.** Evidence admitted under rule 801(d)(1)(B), while conditioned upon the need to rebut a charge of fabrication, may be used by the jury for any substantive purpose to establish the truth of what it says. Fed.R.Evid. 801(d)(1)(B), Advisory Comm. Note. Thus, both grounds for admitting the evidence are equally broad, and the district court's ruling may be affirmed under *Rosenstein. See* note 8 *supra.*

**22.** Provenzano's failure to risk admission of the prior convictions by actually testifying does not prevent him from raising the issue now on appeal. *See, e. g., United States v. Cavender,* 578 F.2d 528 (4th Cir. 1978) (reviewing judgment without discussing issue); *United States v. Smith,* 551 F.2d 348 (D.C.Cir.1976) (same).

ten-year period. Extortion is dishonesty. You can't get around that I don't think.

With respect to the Second Circuit decision, that also involves dishonesty as it's described to me.

(A3463). Second:

In my judgment extortion or conspiracy to take a kickback for a loan involved elements of dishonesty that are highly relevant to credibility.

(A3466). Third:

In my opinion those are significantly relevant to the credibility. I'd like them in. If I had the discretion to do it I would keep out the murder case. That's a crime of violence, it's not directly related to the issue of credibility. And I think we'd be in a very difficult legal situation if shortly on the eve of Mr. Provenzano's conviction in this court next week sometime that murder conviction were to be reversed.

(A3467). Thus, even if the district court initially ruled the two prior convictions admissible automatically under subdivision (a)(2), it is clear that he later found as well specifically that they were "highly relevant" and "significantly relevant" to the credibility of Provenzano. Therefore, even though the district court never explicitly mentioned subdivision (a)(1), we affirm the ruling of admissibility under that subdivision, since the district court implicitly found that the probative value exceeded the prejudicial effect.[23]

### C. *Thomas Andretta Issues*

1. *Evidence of Thomas Andretta's Incarceration*

Over Thomas Andretta's objection, in order to show that FLT was a sham corporation, the Government was allowed to prove that Thomas Andretta, who was supposed to be running FLT, was in jail at all relevant times. The district judge told the jury:

Ladies and gentlemen, it is not disputed that Mr. Thomas Andretta was incarcerated between July 10, 1973 and April 11, 1975. The fact of that incarceration is being made known for a limited purpose to support the government's assertion that Mr. Thomas Andretta was not available to participate in the running of a trucking company which the government claims he incorporated while incarcerated. That is the only purpose for which this evidence is being admitted.

You're not to speculate on the reasons for that incarceration, the place of it or anything else. You are also to draw no inferences because of this—because of this incarceration or the speculative reasons for it; Mr. Thomas Andretta is a bad man or disreputable individual or is any more likely than one who had not had this history to commit that crime. It's a limited purpose and I restricted the use of that evidence to that limited purpose.

(A1174). Thomas Andretta claims that this fact—incarceration—should have been excluded as too prejudiciaal, under Fed.R. Evid. 403, since he was willing to stipulate that he was unavailable, in any language that would satisfy the interest of the Government, so long as there was no mention of incarceration (A937–38).

▮▮▮▮ An offer to stipulate does not automatically mean that the fact may not

---

**23.** We therefore decline to decide whether the two convictions could properly have been admitted under subdivision (a)(2). Nor need we address the unresolved question whether Fed. R.Evid. 403 and its balancing test of probative value versus potential prejudice limit the seemingly absolute admissibility conferred by rule 609(a)(2). *See United States v. Smith*, 551 F.2d at 358 n.20. The balancing test of rule 403 was implicitly applied under rule 609(a)(1) to admit the testimony: in light of the determination that the evidence was "highly relevant" or "significantly relevant," it was not an abuse of discretion not to exclude the testimony under rule 403.

Finally, *Gordon v. United States*, 383 F.2d 936 (D.C.Cir.1967), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968), does not mandate reversal. While the *Gordon* court did say that it is unfortunate when the fear of admission of prior convictions deprives the factfinder of a witness' testimony, *see* 383 F.2d at 940, the court clearly sanctioned admission of such prior convictions where the key issue is, as it is here, the credibility of the accused versus that of the accuser, *id.* at 941.

be proved instead, as long as the probative value of the proof still exceeds the prejudicial effect, taking into account the offer to stipulate. *United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir. 1979) ("A cold stipulation can deprive a party 'of the legitimate moral force of his evidence,' 9 Wigmore on Evidence § 2591 at 589 (3d ed. 1940), and can never fully substitute for tangible, physical evidence or the testimony of witnesses."); *accord, United States v. Caldwell*, 543 F.2d 1333, 1359 n.134 (D.C.Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Particularly in point is *United States v. Campisi*, 306 F.2d 308 (2d Cir.), *cert. denied*, 371 U.S. 920, 925, 83 S.Ct. 287, 293, 9 L.Ed.2d 229, 233 (1962):

> In order to prove the offense charged the government was required to establish that the bonds which were forged had been stolen, although it was not necessary to connect the defendants directly with the thefts. The appellants were willing to concede that the bonds were stolen, presumably in order to keep from the jury evidence of violent thefts which they thought might prejudice the jury against them on other issues. The government expressed its willingness to enter into a stipulation of this general nature, but the parties were not able to agree on the exact language. Campisi contends that the government was obligated to enter the stipulation and that it arbitrarily refused to do so with the result that much prejudicial evidence was needlessly paraded before the jury. A reading of the relevant portions of the transcript leaves much doubt that it was the government that refused to stipulate, but in any event the government had the right to present evidence that the bonds were stolen in the way it wished to present such evidence, not as appellants would have chosen to do so.

306 F.2d at 312. Thomas Andretta was not willing to stipulate to the ultimate fact that FLT was a sham corporation. The inference that must be drawn is that he hoped that the stipulation he accepted would still leave some doubt in the jury's view as to the full extent of his unavailability, such as the possibility that he was on a long vacation or business trip but was always free to come back if an emergency developed or if he so chose. Only by proving incarceration could the Government show Thomas Andretta's total unavailability as a principal officer, tending to prove that FLT was a sham. Moreover, the judge explicitly told the jury not to consider why Thomas Andretta was in jail, rather just to use that fact to prove that FLT must have been a sham because its ostensible chief officer could not have engaged in that role. This distinguishes this case from *United States v. Cook*, 538 F.2d 1000, 1005 (3d Cir. 1976) (abuse of discretion, where evidence of prior crime is called for, to introduce as well evidence of the *nature* of the prior felony).

In light of the failure of Thomas Andretta to offer a suitable stipulation and the conceptual difficulty of structuring a stipulation that would convey the same fact of unavailability due to incarceration without adverting to that concept, we conclude that there was no abuse of discretion in admitting the fact of Thomas Andretta's incarceration, especially with the limiting instruction the court gave.

### 2. *Disqualification of Thomas Andretta's Counsel*

The district court ruled that Robert Eisenberg, Esq. could not represent Thomas Andretta because Eisenberg had represented Picardo on Picardo's murder conviction. Therefore, Eisenberg would be in a conflict of interest situation between the duty of vigorous representation of Thomas Andretta and the duty of loyalty to Picardo, since confidences relating to Picardo's murder conviction and events of that period would be useful to impeach him as a witness against Thomas Andretta.

Thomas Andretta has stated that he was willing to waive effective representation, as the price for retaining Eisenberg. Nevertheless, there is no absolute right to particular counsel where there is an actual conflict of interest, *United States v. Dolan*, 570 F.2d 1177, 1183 (3d Cir. 1978). *Dolan* found ac-

tual conflict of interest where, *inter alia*, the defendant's attorney "could not effectively cross-examine his former client . . .—now an important prosecution witness—without intruding into matters protected by the attorney-client privilege," *id.* at 1184. We held that in such a situation, the district court could—as it did in the present case—"exercise its supervisory authority over members of the bar to enforce the ethical standard requiring an attorney to decline multiple representation" and refuse to accept the defendant's waiver of his right to effective assistance of counsel. *Id.* In the present case, although the district judge did not make explicit findings that Eisenberg knew specific facts that would have involved him in conflict, the district court correctly concluded that he must assume as much, since he could not actually inquire about the matter without thereby himself destroying the confidence (A319–21, A3503–05). Eisenberg's access to privileged information is conclusively presumed. *See, e. g., United States v. Kitchin*, 592 F.2d 900, 904 (5th Cir.) (per curiam) (adopting district court's findings and conclusions), *cert. denied*, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *cf. American Roller Co. v. Budinger*, 513 F.3d 982, 984 (3d Cir. 1975) (civil case); *Arkansas v. Dean Foods Products Co.*, 605 F.2d 380, 384–85 (8th Cir. 1979) (antitrust case). This court has held that counsel could be disqualified in a private antitrust suit because of confidences presumed from an ongoing attorney-client relationship as long as prior work could be turned over to new counsel, *IBM Corp. v. Levin*, 579 F.2d 271 (3d Cir. 1978). This case is no different.[24] Because Picardo's dealings at the time of his murder conviction bore so heavily on this case, it was clear that he could not be cross-examined without going into that sensitive period; therefore, the district judge properly disqualified Eisenberg.

In addition, there was testimony that Eisenberg had himself been involved in incor-

porating FLT (A1193–94). The district court judge, in ruling that Eisenberg was disqualified, specifically mentioned that Eisenberg's "prior representation with respect to FLT and Lift-Van and Picardo" (A321) were substantial factors in its ruling, whether or not Eisenberg was called at trial as a witness. *Cf. Commonwealth v. Duffy*, 483 Pa. 170, 394 A.2d 965 (1978) (counsel cannot be impartial where he knew prosecution witness would claim that counsel would receive stolen guns from defendant as payment for legal services and thus had a personal stake in defendant's acquittal).

### D. Stephen Andretta Issue: Immunized Testimony

Stephen Andretta was immunized before a grand jury in the Eastern District of Michigan on December 10, 1975 and was compelled to testify. The questions he answered there bear on the same subject matter as does the present case.

In ·the present case, Stephen Andretta requested a taint hearing, at which the Government would have had to demonstrate that its evidence was not the fruit of the grand jury testimony.[25] The district court refused, holding that a review of the Government's documentary evidence revealed that as of a prior date it already had all the information Stephen Andretta later disclosed in Michigan (A356–58). The issue facing us is whether the district court's finding that the Government carried its "heavy" burden of showing lack of taint, based on the Government's documentary evidence submitted at trial, reproduced in the Government's Supplementary Appendix, is clearly erroneous. *See United States v. Romano*, 583 F.2d 1, 7 (1st Cir. 1978); *United States v. Jones*, 542 F.2d 186, 199 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).

In the present case, although no hearing was held, the Government's position is that none was needed because the

---

**24.** In the present case, Eisenberg was not prohibited from consulting with new counsel on factual background.

**25.** Such evidence cannot be used. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

issue was correctly resolved on the documents submitted. *Romano* relied partially on documents, *see* 583 F.2d at 8, although it stated that a hearing normally is held, *id.* at 7; *accord, United States v. Nemes*, 555 F.2d 51, 54–55 (2d Cir. 1977); *United States v. Bianco*, 534 F.2d 501, 508–11 (2d Cir.), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). If the Government's documents conclusively demonstrate prior knowledge, we know of no reason why a hearing must be held.[26] We have examined the record and the individual claims of taint. We conclude that the district court correctly found that Government documents dated before the start of Stephen Andretta's Michigan testimony clearly show prior knowledge of all the meager information Stephen Andretta supplied in Michigan. Aside from *pro forma* and unnecessary testimony of the authors of the documents concerning their authenticity, nothing could have been added by holding a hearing. Therefore, we need not reverse Stephen Andretta's conviction or even remand for an evidentiary hearing.

### III.

We conclude that the district court did not commit reversible error in any of its trial rulings. Nor did the district court err in denying the new trial motions. Thus, we are satisfied that all three appellants, Anthony Provenzano, Thomas Andretta, and Stephen Andretta, received fair trials. We will therefore affirm all three judgments of sentence.

---

**26.** *United States v. De Diego*, 511 F.2d 818, 822 & n.4 (D.C.Cir.1975), merely states the converse: that the indictment cannot be dismissed without giving the Government the opportunity to show at a hearing that there is no taint.