UNITED STATES of AMERICA

v.

Harry HOFFER, Defendant-Petitioner.

No. 72 CR. 1365 (MP).

United States District Court,
S. D. of New York.

Dec. 8, 1976.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York by W. Cullen Mac-Donald, Asst. U. S. Atty., New York City, for the United States.

Ralph S. Naden, New York City, for defendant-petitioner.

POLLACK, District Judge.

The defendant, Harry Hoffer, moves pursuant to Rule 33 Fed.R.Crim.P. for an order setting aside his June 1973 conviction of conspiracy and fraud and for a new trial on the grounds of newly discovered evidence and denial of the effective assistance of counsel in his defense.

In June 1973, Hoffer was found guilty by a jury of conspiracy; foreign transportation of money stolen or obtained by fraud; use of a fictitious name in carrying out a scheme to defraud by mail; and mail fraud. Each of his co-defendants at the trial, Messrs. Frank, Hemlock, and Berman, was also found guilty of some or all of these crimes.

The Court of Appeals upheld the conviction (*United States v. Frank*, 494 F.2d 145 (2d Cir. 1974) (Op. per Friendly, J.) and review in the Supreme Court was denied on October 14, 1974 (*Hoffer v. United States*, 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974)). Hoffer received a jail sentence, as modified, of 18 months imprisonment under which he served from September 17, 1975 to June 9, 1976 when he was paroled; the parole supervision is to end on March 16, 1977.

Hoffer voluntarily elected not to testify at his trial. Since his conviction Hoffer has repeatedly asserted that he did not participate in the spoils of the fraud as suggested by testimony of a government witness but, in fact, only his co-defendants had shared therein. Since the trial Hoffer has obtained documentation thereof. If he had taken the stand at the trial he could have so told the jury and he could also have told the jury that although the transactions were suspect he did not know what was going on or that his role was that only of an innocent dupe. He says that he wanted to testify but that his lawyer dissuaded him from taking the witness stand in the service of the personal interests of the co-defendant Hemlock, who was deeply involved, because Hemlock had paid Hoffer's legal fees.

Except for the current addition of charges against his trial lawyer, Hoffer has on several prior occasions asserted the same theme, that he did not share in the proceeds of the swindle. He asserted this in 1973 in connection with the sentencing proceedings, again in connection with an application made in 1974 to reduce or modify his sentence, and again on this motion for a new trial made in November 1976.

In 1973 Hoffer told the probation officer for purposes of the presentence report the following:

Notwithstanding, I want to state two things—I did not receive one penny, not one dime . . . The other thing—I was accused of various actions. Whatever I did I was employed by Mr. Hemlock and did at his instruction. He told me that the defrauded party had full knowl-edge . . . I'm a schlepp-along. I was dragged along—whether you want to call it stupidity or allegiance.

After his unsuccessful appeal of his conviction Hoffer applied for a modification or reduction of sentence, the papers again reiterating the absence of personal profit to him from the swindle. No suggestion was made by him then that his failure to take the witness stand on his own behalf was due to tainted judgment of his counsel.

The nub of the motion to modify the sentence, apart from claim of hardship, was summarized by Hoffer's attorney as follows:

It is urged that in reexamining the petitioner's sentence, the Court may now take into consideration sworn statements which are uncontroverted that show conclusively he had no knowledge of any wrongdoing. For that reason, Harry Hoffer has set forth in detail, under oath, crucial facts which show that he had no knowledge of any alleged fraud perpetrated against Mrs. Dominguez. He has previously asserted to this Court that he never received any funds from this transaction, a fact never disputed by the government. In his affidavit, Harry Hoffer swears that he was never an owner of any time deposit accounts in the names of Columbia Corporation, Ltd. or Splindian Investments, Ltd., or for that matter, any other time deposit account maintained in the Bahamas. The bank records in the Bahamas will verify this.

This motion for a modification of sentence was successful to the extent that Hoffer's prison term was reduced in August 1975 from three years to eighteen months for reasons not pertinent hereon.

Disbarment proceedings had been instituted against Hoffer and Hemlock in 1974 and hearings were held before a State Court Referee. In those proceedings Hoffer was represented by John McGillicuddy, Esq., who had represented Berman, a co-defendant, prior to the trial and again on appeal of this case. Although McGillicuddy had been present at the joint strategy meeting of counsel with Hemlock and pre-

sumably was aware of all that occurred there, no suggestion was made in the disbarment proceedings, at which Hoffer called his trial lawyer to testify for him, that the independent integrity of the lawyer had been corrupted.

In the present application brought by a fifth attorney Hoffer recites that in the 1974 disbarment proceedings he obtained an acknowledgment from the Nassau bank in which the spoils were deposited that Hoffer was not authorized to draw on the accounts and that this is newly discovered evidence.

Additionally, Hoffer now accuses his trial lawyer of not having adequately cross-examined the bank personnel who testified at the trial and of not having presented any defense for Hoffer, because in Hoffer's opinion, "his trial lawyer's interest was 'in helping Alfred Hemlock in his defense' ", "a clear violation of my Sixth Amendment right to counsel".

In his affidavit in support of the present motion Hoffer recites the manner in which his lawyer was retained:

Hemlock stated to me that since he was primarily involved and had made money on the Dominguez transactions, whereas I had not profited at all, he would assure payment for the legal services that I would require. He told me that he would approach co-defendants Steven Berman and John Frank to see if they would contribute toward the cost of my lawyer's services.

Hemlock and I consulted with Mr. LaRossa, who indicated that his fee would be $15,000. Mr. Hemlock agreed, and told Mr. LaRossa that he would represent me. I paid no money at all for those legal services; I believe that Mr. Hemlock paid the full costs on my behalf.

The supporting affidavit of Hoffer's present attorney expands Hoffer's affidavit with the conclusory statement that Hoffer's trial counsel

was paid by Alfred Hemlock, and who was requested to keep Hoffer off the witness stand because Hoffer would have furnished testimony that would have buttressed the government's case against Alfred Hemlock and would have exculpated himself.

And the present attorney concludes with the charge that

because his attorney was paid by the co-defendant, no case was put in for him at all, in a matter in which there was a substantial defense case to be made.

At Hoffer's disbarment proceedings Mr. LaRossa, Hoffer's trial lawyer testified that

I strongly recommended to Mr. Hoffer that he not take the stand in his own defense for a number of reasons.

The first is I had very serious doubts about whether his implication within the conspiracy had been proved to a legal satisfaction.

In addition to that, I believed that even if the judge did send the case to the jury, the jury would have difficulty in believing the testimony of the complainant.

The third reason is that Mr. Hoffer was, in my opinion, a nervous individual, and based upon his nervousness, I did not think that he would be presented to a jury in as good a fashion as he did when he was having a conversation with two or three individuals. For those reasons, I strongly suggested that Mr. Hoffer not take the stand in his own defense.

At the disbarment hearing Hoffer tersely stated: "I was advised not to take the stand and stupidly I did not." Amplifying his reasons he said:

Q. Would you give the Referee that reason?

A. Yes. Up to that point I had never handled any criminal matters in my entire legal practice. I was represented by an attorney who was familiar or had knowledge or was involved in cases in the—in criminal cases in the Federal Court. I told him that I wanted to testify and he told me, and my wife who was also there, that in his opinion he didn't believe that the government had proved a case, had introduced sufficient evidence and therefore he said, "I don't believe you should testify."

It was a judgment that I regret to this day but it can't be reversed, that I didn't testify. I wanted to, but, you know, the old expression, someone who represents himself has a fool for an attorney and especially—

Hoffer's affidavit on the present motion reiterates:

Relying on his (Mr. LaRossa's) strongly stated opinion, I did not testify at trial . . . My position, therefore, is not that I received ineffective assistance of counsel but that—in substance—I was not represented at all.

Annexed to the moving papers are affidavits of two of the convicted co-defendants, Steven Berman and John J. Frank.

The Frank affidavit is no more than a recitation of hearsay attributed to Hemlock and Berman. He expresses nothing of personal knowledge and was not present on any occasion where LaRossa was also present and reports no conversations by or with LaRossa. The only contact that Frank reports with Hoffer is of a statement by Hoffer that he wanted to testify in his own behalf because he felt he had nothing to hide.

Berman's affidavit states that he was present at a joint luncheon and strategy discussion during the trial at Gasner's Restaurant with McGillicuddy, Direnzo, LaRossa, and Hemlock. He states that LaRossa told the group that Hoffer was insisting on testifying and would tell the truth, as he saw it, about the case; that it was then decided that the defendants would rest and put in no defense; that LaRossa said that he would convince Hoffer that the government case was very weak and no defense need be introduced; and that LaRossa stated that if Hoffer testified "we would all be convicted with the possible exception of Hoffer."

Subsequent to the date of the Berman affidavit an illuminating set of letters from Berman was received by the prosecutor, AUSA Cullen MacDonald, dated respectively, November 3, 1976 and November 4, 1976.

In the first of the two letters Berman wrote

I spoke to Gary last week and he mentioned to me the statements that John Frank and I gave Harry Hoffer. *Neither of us meant to indicate that Harry was innocent of anything and would have been acquitted if he had been represented differently.* At that time Hemlock's only concern was that Hoffer would make a deal with your office and plead guilty and then testify against us. Hemlock arranged through Mike Direnzo to get LaRossa and to convince Hoffer that he would be in better position if he went along with us. In fact Hoffer was far more culpable than Frank and I, as he had gone to Canada, arranged for the land, then went to Nassau and arranged all the details. John and I, while willing to go along did not know of the details themselves until Hoffer had arranged them. Hoffer met almost weekly with Mrs. Dominguez as he was advising her regarding her tax situation and he indicated to her that the land investment would be a tax boon for her.

At the time of the trial, Hemlock was concerned that Hoffer would fold up, and then testify for you. He was able to convince LaRossa to go along with the case until such time as your case was finished.

When you rested the government's case, LaRossa, Bender and my attorney [McGillicuddy] were convinced that there would not be any conviction, thus no defense was put in. We had a fairly heavy defense planned and then it was scrapped, as the three attorneys felt that enough reasonable doubt existed to insure at least a hung jury. No expert had testified as to the actual value of the land and we had one ready to go. I think that at the time of the deliberations, even you were not sure that a conviction was going to come out of the jury room.

John and I felt that Harry was going to use the statements as mitigation for the Bar association. I think that after serving only about 8 months and getting only a suspension from the bar he came out

pretty well, all things considered. *He was paid $25,000 at the time of the land deal and in addition got a law partnership from Hemlock* which is still paying him plenty. All in all, he received more than any of us.

While it is true that LaRossa was hired by Hemlock and paid by the three of us, he did state that *if* he felt that the case was going badly, he would place Hoffer on the stand to mitigate his own position. (Emphasis added)

In his second letter to the Assistant United States Attorney of November 4, 1976 Berman stated

Both John and I are writing Naden [Hoffer's present attorney] to tell him that we cannot aid him, as anything that we could state would merely be hearsay, and be repeating what Hemlock told us. In addition, his client was at least as culpable as we were and more, since he actually carried out all the mechanics of the deal.

The affidavit of Mr. LaRossa on this application states that he was retained by Harry Hoffer; that at no time did he have a conversation with Alfred Hemlock involving the issue of keeping Mr. Hoffer off the witness stand because his testimony would be beneficial to the government's case; that at no time did he have a conversation with Mr. Hemlock, Mr. McGillicuddy, Mr. Direnzo or the defendant Stephen Berman with respect to the issue of Mr. Hoffer's testimony and the repercussions of his testimony to the other defendants; and that at no time did he have any conversation with Mr. Hemlock and Mr. Direnzo with respect to keeping Hoffer in line and keeping him from cooperating with the Government.

John M. McGillicuddy, Esq. was shown the affidavit of Stephen Berman dated June 3rd, 1976 and has supplied the following affidavit:

With respect to paragraph 2 of said affidavit wherein it is stated that a conversation was had regarding securing an attorney for Harry Hoffer that could be controlled, the statement is false.

With respect to paragraph 3 of said affidavit wherein it is stated that Harry Hof-fer was prevented from testifying for the reasons therein assigned, the statement is false.

Michael P. Direnzo, Esq. was also shown the affidavit of Stephen Berman sworn to June 3rd, 1976. His affidavit hereon states that upon being asked for the name of a competent trial attorney versed in criminal law he suggested and recommended James LaRossa, Esq. He states further that "There was absolutely no mention, directly or indirectly, that Mr. LaRossa could or would be controlled."

Referring to the luncheon at Gasner's Restaurant Mr. Direnzo states that "there was no mention by Mr. LaRossa that if Mr. Hoffer testified all defendants would be convicted with the possible exception of Hoffer" and that "There were no discussions among Mr. Hemlock, Mr. LaRossa, and myself where the subject was 'keeping Hoffer in line and keeping him from cooperating with the government'. I did, however, have an occasion to state that I thought Mr. Hoffer would be a poor witness."

At the disbarment hearings it was McGillicuddy who elicited LaRossa's reasons for his recommendation to Hoffer that he not take the witness stand. These were solid, valid reasons and good professional strategy as it appeared to the parties at the time. On the cross-examination of LaRossa he testified that he alone had made the strategy decision and that it was not as a result of a purpose among counsel to serve Hemlock. His testimony was that in his opinion the evidence was weak and *none* of the defendants could be convicted on the facts; and that there was *no division* among the defendants as to what the facts were or that they favored Hoffer over the others.

Hemlock's version of the Gasner Restaurant meeting was as follows (as given in the disbarment hearings)

And at that time we all—we thought that there was additional witnesses or some testimony would be put in. We felt, and I don't know—I can't read anybody else's mind, but the consensus of opinion was

that Mrs. Leon's testimony was incredible, and Mr. LaRossa spoke to Mr. Hoffer and Mr. Direnzo spoke to me, and said, 'We are not very certain that she has even proved a case. Although we don't know whether the—we don't believe the Judge is going to dismiss the case. But we think the sum and substance is insufficient as a matter of law to prove a case.'

.    .    .    .    .

And Mr. Hoffer in my presence—and his wife was present, too. His mother happened to be there. But she wasn't in that conference. She was sitting through the trial, as well as my daughters.

Mr. LaRossa expressed to Mr. Hoffer that in his considered judgment he believed they had not proved a case, and his advice and counsel was not to go forward in so far as a defense was concerned.

The Referee on the disbarment proceedings stated, after reviewing the substantial contacts that Hoffer had with the steps in the swindle, that to him

The question is: Should Hoffer have believed what Hemlock told him:

The Referee's report concluded

in my opinion it did not cause him to suspect, that his employer was engaged in a scheme to defraud Maria, and that he, Hoffer, was furthering it.

The Referee did not advert to the obligation of attorney Hoffer to the client whom he was serving so prolifically and what she had a right to expect from him in the circumstances and whether Hoffer was entitled to blindfold himself to avoid the obvious.

The viewpoint and assertions now contained in Berman's letters quoted above were apparently not called to the Referee's attention by Hoffer or those who appeared on his behalf as witnesses.

Suffice it to say, that on the trial evidence the jury could have concluded that Hoffer was heavily implicated in the fraud, and did so.

The Appellate Division to which the Referee reported his opinion that Hoffer was not guilty rejected this suggestion as beyond the scope of the Referee's function, ruling that

However, we do not agree with the legal conclusions of the Referee couched as they are in terms of overcoming the presumption of guilt created by a criminal conviction.

The teaching of *Matter of Levy* (37 N.Y.2d 279, 372 N.Y.S.2d 41, 333 N.E.2d 350) is that the issue of guilt based on a prior conviction may not be relitigated,

.    .    .    .

Hoffer's testimony at the disbarment proceedings is revealing and his admissions there show conclusively that testimony from him as to his intimate connection with the successive steps in the swindle, commencing from the search in Canada for a piece of property to use as a vehicle through to the deposit of the spoils in bank accounts which he opened in the names of dummy corporations as the assistant secretary thereof, would have implicated him by reason of the details even more inextricably than the government had shown. He admitted to the Referee the pivotal role he played in the steps taken in making the fraud scheme succeed; his testimony overall would not have been exculpatory, other than his intended denial that his role had been knowledgeable or with the intent to further the swindle.

Hemlock told Hoffer in substance and effect that he was assigning Hoffer to handle the legal and business matters for a client. Hoffer, a lawyer, was entrusted with the interests of that client. He was told that she desired to remunerate the three, Hemlock, Berman and Frank, by allowing them to buy land located outside the United States and to resell it to her at a higher price and the difference would be applied toward their remuneration; the prospective difference being about $1,000,-000., to be divided among the three equally. He was told that the closing would be outside the United States, in Nassau, because the client was an alien.

The Referee's report relates many of the intermediate and essential steps as told to

him by Hoffer and other witnesses in the disbarment proceedings.

Hoffer questioned the circuitous methods involved in the land transactions and their purpose and asked Hemlock for the reason thereof but Hemlock ignored the inquiry, did not discuss it with Hoffer and, strangely, Hoffer did not think it was his place to raise any further question about it "as a mechanic" (a lawyer-mechanic) "handling a real estate transaction" for a client whom he was representing.

Hoffer went to Canada to help find suitable real estate for the plan, to set up the needed personnel, legal and real estate, and to arrange the transactions. ·

Hoffer went to Nassau and arranged to procure two "inactive" Nassau corporate set-ups, Columbia and Splindian (the names of the dummy corporations), and had his co-defendants named as the stockholders, directors and officers and had himself appointed Assistant Secretary so he could handle things in Nassau. Hoffer opened the checking account for Columbia in Nassau, made the initial deposit of $5,000, arranged for the time and place of the closing of the purchase and sale by it of the Canadian land, deposited Mrs. Dominguez' moneys, drew checks for the selling price of the Canadian parcels and for legal fees and other fees and expenses incurred to the Canadian parties and then transferred the balance of his client's moneys to three separate time deposit accounts over which Hemlock, Frank and Berman respectively alone had power to draw. Hoffer handled the post-closing clearance of papers. He acted similarly with respect to another piece of Canadian property where Splindian was used in Nassau and he directed the Nassau bank to transfer the $150,000 net remaining in the Splindian account into two separate equal time deposits on which Hemlock and Berman alone had power to draw.

The testimony at the hearing showed that during the period from the deposit of the spoils in the bank until Hoffer set up the time deposits, he alone had authority over the money. Many more of the details of Hoffer's connection with the transactions were adduced. The trial record also contains much of the same.

■ To succeed on a motion for a new trial on the basis of newly discovered evidence, a defendant must show, *inter alia,* (1) that the evidence was discovered after trial, (2) that it could not, with the exercise of due diligence, have been discovered sooner, (3) that it is so material that it would probably produce a different verdict. *United States v. Slutsky,* 514 F.2d 1222, 1225 (2d Cir. 1975).

Hoffer's claim fails each of the foregoing tests. The evidence of those who were signatories for withdrawals from the Nassau accounts was not a discovery or revelation to Hoffer—he knew this all along because he had made the arrangements. The actual bank record would not have produced a different verdict; there were too many other steps that Hoffer was involved in for him to convince the jury to acquit him. His testimony that he was merely an unknowing dupe for the scheme of the other three would have collided with too much to be explained, at every step in the course of executing the transactions, to expect a jury to accept such a story from the law office associate assigned to the tasks by Hemlock, euphemistically denominated as the "mechanic on a real estate transaction." The additional evidence from the bank concerning the accounts and who was authorized and withdrew funds therefrom would have been most inconsequential under the facts and circumstances in the record.

■ Second guessing the trial strategy adopted does not aid a claim for a new trial.

In footnote 11 to its affirmance of the conviction, the Court of Appeals pointed out (494 F.2d at 153):

Appellate counsel for Hoffer suggests that the decision of trial counsel not to call this defendant was based simply on a belief that, despite the contrary ruling of the trial judge, the government had not presented a sufficient case to warrant that course. Perhaps so, but the defendant is bound by the strategy that was chosen.

■ The Sixth Amendment claim is no better. Hoffer was not prejudiced by Hemlock's having paid LaRossa. This is not necessarily a disqualifying circumstance nor does it necessarily create a conflict of interest. In this case it was harmless to Hoffer. *United States v. Wisniewski,* 478 F.2d 274, 281–85 (2d Cir. 1973). Hoffer was present at and acquiesced in that arrangement— voluntarily, without protest or reservation. *Cf. United States v. Armedo-Sarmiento,* 524 F.2d 591, 592 (2d Cir. 1975). No actual conflict of interests resulted therefrom.

As already indicated, the evidence he was "prevented" from giving, to wit—his testimony, would in all probability not have produced a different verdict. Hoffer would have been convicted in any event, in the Court's judgment.

Any suggestion of an omission to defend Hoffer's interests is forcefully negated by the record which shows his trial counsel's aggressive, incisive and very competent and thorough cross-examinations of the government's witnesses. It was largely due to the leading role that LaRossa took in attacking the government's case that caused the defendants and their counsel to be of the view that the government's case had been weakened to the point of justifying the hope and expectation by them of a verdict for defendants, without more. Nothing was left unexplored that had any material bearing. Hoffer was effectively represented and his right to counsel was not undermined or impaired at trial. Hoffer's appearance on the stand and being subjected to cross-examination step by step over the route of the land purchases and sales, handled to a major degree by Hoffer, could easily have undone what the attack on the government's case had accomplished.

■ After all is said, there was a gross swindle, an unconscionable depredation of the assets of a law office client, and Hoffer was the associate of that office who was placed in charge of the client's interests and willingly followed instructions and carried out the significant details. Was he a knave or a dupe? His lawyer made a bona fide judgment on the value of his testimony and

appearance on the stand. He was free to accept or reject that judgment. There is no factual evidence of coercion or undue influence exercised to obtain his consent. Hoffer, a lawyer himself, understood both the rationale and finality of that trial strategy and decision. He and Hemlock both admit that each knowingly waived his rights to present other defense evidence including their own testimony at the joint conference with all of the defense attorneys. *United States v. Armedo-Sarmiento, cit. supra.*

Hoffer, a lawyer, could not successfully escape a charge, as a minimum, of conscious disregard of whether the transactions were legitimate or not, with a high degree of awareness of their palpable irregularity. That was enough for a jury on which to draw inferences of guilt.

■ There is no factual evidence that the independent integrity of Hoffer's trial attorney or his decision was contaminated. No real conflict has been shown to exist on which to erect a Sixth Amendment contention. *United States v. Mari,* 526 F.2d 117, 119 (2d Cir. 1975). The application hereon is addressed to the sound discretion of the Court. *United States v. Costello,* 255 F.2d 876, 884 (2d Cir.), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). There are no facts on which a Court could or should properly exercise its discretion in favor of a new trial.

A case which nearly parallels the present one is *United States v. McCord,* 166 U.S. App.D.C. 1, 509 F.2d 334 (1974) *cert. denied,* 421 U.S. 930 (1975). In *McCord,* a convicted defendant in the Watergate case argued on appeal that his trial counsel's overriding loyalty to the White House had denied him effective assistance of counsel. Of the attorney's contacts with White House officials regarding such issues as financial support, clemency and "cooperation" the Court said

At best they indicate only that McCord's attorney was consulting with the persons who arguably authorized the crime for which McCord was being tried and was [sic] allegedly involved in the same conspiracy that McCord himself was involved

in, hardly evidence of a conflict of interest. (*Id.* at p. 352).

Hoffer's sentence took into consideration the fact that he was less culpable than his co-defendants. He is entitled to no further consideration. There is no factual or legal basis for setting aside the conviction for a new trial. Motion denied.

SO ORDERED.