**UNITED STATES of America, Plaintiff,**

v.

**Anthony PROVENZANO, et al., Defendants.**

**Crim. No. 79–72.**

United States District Court,
D. New Jersey.

Sept. 4, 1981.

William W. Robertson, U. S. Atty., Newark, N. J. by Jeffrey Speiser, Asst. U. S. Atty., Newark, N. J., for the Government.

Harvey Weissbard, West Orange, N. J., and Maurice Edelbaum, New York City, for defendant Provenzano.

John L. Pollok, New York City, for defendant Thomas Andretta.

Donald R. Conway, Hackensack, N. J., for defendant Stephen Andretta.

MEANOR, District Judge.

It is quite certain that this nation's founding fathers, the framers of our Federal Constitution and the Bill of Rights, never envisioned that the right of a criminal defendant to a speedy and public trial in an arena where witnesses could be confronted by cross-examination, would evolve into merely a dress rehearsal for a long-running soap opera of post-conviction relief. The longer such a drama runs, the less faith society has in a system which appears never to give justice its due.[1]

Just as "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused," *Barker v. Wingo*, 407 U.S. 514, 519, 92 S.Ct. 2182, 2186, 33 L.Ed.2d 101 (1972), so is there a societal interest in the finality of judgments which result from those speedily provided trials. A jury's guilty verdict at a trial provided within the parameters of both the sixth amendment's speedy trial clause and the Speedy Trial Act of 1974, 18 U.S.C. § 3161 et seq., is meaningless to society when endless post-conviction motions to attack collaterally facets of the trial operate to stay the final judgment into the distant future. It is indeed ironic that a speedy trial which results in a guilty verdict, swiftly begets impediments to finality. Congress[2] and the courts[3] have expressed the public's right to speedy justice. It is an increasingly empty right when well-financed, convicted defendants attempt to prolong the final day of reckoning by abusing the post-conviction relief process.

Defendants Provenzano, Thomas Andretta, Stephen Andretta and Gabriel Briguglio were indicted on February 22, 1979 and were brought to trial within the time mandated by Congress in the Speedy Trial Act. After a three-week public trial they were all convicted by a jury on May 25, 1979. On July 3, 1979, Provenzano moved for an evidentiary hearing with respect to an alleged violation of the court's jury sequestration order. The other defendants joined in the motion. On July 6, 1979 after a hearing on the motion, the court denied Provenzano's request for leave to question members of the jury. Four days later, on July 10, 1979, the court denied all defendants' applications to vacate the jury verdict and to enter judgments of acquittal, and sentenced them. After sentencing Provenzano and Thomas Andretta each to twenty years' imprisonment and fines of $20,000, the court denied them bail pending appeal and ordered them remanded to custody. Provenzano and Thomas Andretta then sought an order from the Court of Appeals for the

1. See Coleman v. Balkcom, —— U.S. ——, 101 S.Ct. 2031, 68 L.Ed.2d 334, on denial of cert., —— U.S. ——, 101 S.Ct. 2994, 68 L.Ed.2d 334 (1981) (Rehnquist, J., dissenting), where Justice Rehnquist urged the Court to grant certiorari in a death penalty case in order to conclude "endlessly drawn out legal proceedings." —— U.S. at ——, 101 S.Ct. at 2995. Justice Rehnquist argued that it makes a "mockery of our criminal justice system" when a convicted criminal defendant continues to get multiple "bites at the apple" in various courts seeking constitutional error, after his trial and sentence have been affirmed upon appellate review. Id.

2. See the legislative history of the Speedy Trial Act of 1974, H.R.Rep.No.93–1508, 93d Cong., 2d Sess. 4, reprinted in [1974] U.S.Code Cong. & Ad.News 7401 et seq.; Lite, The Pre-Accusation Delay Dilemma, 10 Seton Hall L.Rev. 539, 554 (1980).

3. See e. g., Strunk v. United States, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

Third Circuit releasing them, which was denied on August 21, 1979, *United States v. Provenzano*, 605 F.2d 85 (3d Cir. 1979).

All defendants appealed their convictions. While the appeal was pending, Provenzano, Thomas Andretta and Briguglio moved for a new trial or expansion of the trial record. Provenzano also moved for the recusal of the trial judge for the purpose of hearing the new trial motion.[4] On September 21, 1979, Provenzano withdrew his recusal motion and, after a hearing, the court denied the defendants' new trial motions. Three days later, on September 24, 1979, Provenzano filed a notice of appeal from the court's denial of his motion for a new trial. On September 28, 1979, Thomas Andretta and Briguglio filed similar notices of appeal. On May 8, 1980, the Court of Appeals denied the consolidated appeals of Provenzano and both Andrettas, *United States v. Provenzano*, 620 F.2d 985 (3d Cir. 1980).[5] Those defendants petitioned the United States Supreme Court for a Writ of Certiorari which was denied on October 14, 1980, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129.

On January 13, 1981, Provenzano filed a notice of motion pursuant to Fed.R.Crim.P. 33 for an order granting a new trial on the basis of newly discovered evidence. Stephen Andretta filed the same motion on January 16, 1981 and Thomas Andretta joined on March 18, 1981. After repeated requests by Provenzano for adjournment of the hearing date, on May 11, 1981 this court heard argument on defendants' motions and reserved decision. Less than one week later, Provenzano's attorney contacted the court and requested that decision on the motion be withheld because he intended to file a motion for the court's recusal. On

June 5, 1981, Provenzano filed the recusal motion. Neither of the Andrettas joined in that motion. After a hearing on June 22, 1981, the recusal motion was denied. While decision was reserved on the Rule 33 motions, the court heard motions on July 27, 1981 by Thomas and Stephen Andretta to reduce their sentence. Thomas Andretta's motion was denied and Stephen Andretta's motion was granted.

It is now more than two years since the defendants in this case were convicted of violating the federal racketeering laws. This court must now rule upon motions by Anthony Provenzano, Thomas Andretta and Stephen Andretta (hereafter collectively "Provenzano") for a new trial based upon "newly discovered evidence." The evidence which is alleged to be newly discovered is (a) two FBI 302 investigative reports, (b) documents from the file of a United States Magistrate and Clerk's docket sheet detailing the issuance of a complaint charging witness Ralph Picardo with escape, and the warrant of arrest for that escape issued out of this district, and (c) Picardo's testimony in a later trial, allegedly inconsistent with his testimony in the instant case.[6]

### THE 302s

Provenzano contends that the 302s were not turned over to the defendants under the court's *Brady* order, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967), and that they contain information which, had counsel been aware, could have been used to impeach the credibility of Picardo with respect to an alleged trip to Miami, Florida in late 1973. It was during the Miami trip that Picardo claimed he discussed "labor peace" involving his company, Lift-Van, with Provenzano.

---

**4.** The Court of Appeals remanded the matter to the district court during the pendency of the appeal of the convictions, solely for the purpose of allowing the district court to rule on the new trial motions.

**5.** The complex and convoluted history of Briguglio's numerous appeals is set forth in the opinion of this court denying that defendant's motion for a new trial. *United States v. Provenzano*, Cr.No. 79–72 (D.N.J. July 1, 1981).

**6.** No one involved with this case disputes that Picardo, a federally-protected witness, was the key prosecution witness. The Court of Appeals noted that the only direct proof of Provenzano's participation in the conspiracy came from Picardo's testimony. *United States v. Provenzano, supra*, 620 F.2d at 999.

One 302 recounts an investigation by FBI Agent Smith on January 15, 1976 during which an executive of a sporting goods store at the Americana Hotel was interviewed with regard to whether Provenzano or Picardo had made purchases of clothing during the time when Provenzano was allegedly at the hotel. A review of sales receipts indicated no such sale nor did the executive recall seeing Provenzano, with whom he was acquainted. The 302 concludes: "It should be noted that the records revealed numerous cash sales where no names were obtained."

The other 302 details an investigation by FBI Agent Sullivan of Eastern Airlines' microfilm reservation records for the period November 8, 1973 through November 15, 1973 searching for reservations in the name of Andretta, Briguglio or Picardo from Newark to Miami or Ft. Lauderdale and return. No such names were found in the microfilm records. Sullivan interviewed the Past Date Records Clerk who advised "that it would have been possible to have obtained transportation via Eastern Airlines for the above indicated time period without having that information recorded on their microfilm reservation records."

Provenzano contends that these 302s were never produced to defense counsel, *see* Affidavits of Harvey Weissbard, Esq. (Provenzano's present counsel), Jay Goldberg, Esq. and Gerald Shargel, Esq. (Provenzano's trial counsel), and that they are material to his defense. The Government asserts that the 302s were provided prior to trial, *see* Affidavit of Jeffrey Speiser, Special Attorney, Department of Justice (the Government's trial counsel). Provenzano contends that the 302s first surfaced in *Brady* material produced for the trial of Frank Tiari in the Southern District of New York in November 1980, approximately 18 months after the trial in the instant case. (Tiari and Provenzano retained the same trial counsel, Jay Goldberg.) Thus, Provenzano alleges that the evidence is newly discovered and should be the basis for a new trial. Provenzano further alleges that FBI Agent Smith, who testified as a defense witness, committed perjury or purposefully attempted to create a false impression when he didn't mention the interview with the sporting goods store executive and, thus, tried to mislead defense counsel and the jury concerning the extent of the FBI's investigation to verify Picardo's alleged trip to Miami.

### THE "ESCAPE" DOCUMENTS

While in the Federal Witness Protection Program, Picardo was incarcerated for a time at a facility in Portland, Maine, where he was classified as a "trustee" and afforded certain privileges. On December 23, 1976, Picardo walked away from the facility. Upon being informed of the walkaway, Robert Stewart, then a Special Attorney with the Department of Justice who had been dealing with Picardo, notified William W. Robertson, then head of the Newark Strike Force, of the escape. Robertson had a complaint filed with United States Magistrate William J. Hunt on December 23, 1976 (Mag. No. 76–2134MG–2), charging Picardo with a violation of 18 U.S.C. § 751(a)—Escape from custody, and requested that an arrest warrant issue. It was further ordered that the complaint be sealed. Picardo was arrested the same date by two FBI agents in New York State after they received a teletype that a warrant had issued for his arrest. On February 9, 1977, 48 days after the escape, the United States Attorney in Portland, Maine declined prosecution of Picardo for the incident.

One of the FBI agents who arrested Picardo filed a 302 report of his complete investigation of the matter. That report was included in the *Brady* material turned over to defense counsel prior to trial. The report included reference to the declination of prosecution by the United States Attorney in Maine. Agent Cummings, who filed the report, was called as a defense witness as was Agent Bergholtz, the other arresting agent, to impeach Picardo after he testified that he had not escaped, but had merely left the facility thinking he had permission.

Provenzano contends that the Government's cross-examination of the arresting

agents intended to convey the impression that the United States Attorney in Maine had accepted Picardo's version of the event and declined prosecution, thus freeing Picardo from any future difficulty arising out of the escape. Provenzano urges that the existence of the escape complaint filed with Magistrate Hunt, which was not dismissed until March 1978 upon application of Robert Stewart, was a "sword" over Picardo's head which created a motive for him to testify falsely at the trial. Inquiry by defense counsel into this area was precluded, Provenzano asserts, because the Magistrate's and Clerk's documents were not provided with the *Brady* material. These documents were unknown to defense counsel until they were produced for use in the Tiari trial.

## THE "AGREEMENT" ON PICARDO'S RETRIAL

The final ground upon which Provenzano asserts he is deserving of a new trial is that Picardo materially changed his testimony in the Tiari trial from the Provenzano trial testimony on the issue of what he understood his status was with regard to a retrial in Hudson County, New Jersey on a murder conviction which had been reversed. Provenzano alleges that Picardo perjured himself in the instant case when he said that he "hoped" he would not be retried, in light of his later testimony in the Tiari trial that he had "an agreement" not to be retried.

Provenzano asserts that this false revelation of Picardo's state of mind at the trial went directly to his motivation to testify in a biased manner. The defendant contends that this motive to testify falsely went directly to an attack on Picardo's credibility. Provenzano argues:

> Knowledge that the prosecuting authorities are holding out the certainty of freedom from a charge of murder creates an incentive of the highest order to support the prosecution's case. It is many orders of magnitude greater than a mere "hope" that such a retrial will not take place.

Defendant's Supplemental Brief in Support of the Motion at 4.

**7.** The Court of Appeals recognized that Provenzano's connection to the conspiracy did not

## EVIDENTIARY HEARING

An evidentiary hearing need not be held in every case where a defendant seeks a new trial on the basis of newly discovered evidence. *United States v. Johnson*, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946); *United States v. Herman*, 614 F.2d 369, 372 (3d Cir. 1980). A motion for a new trial ordinarily may be decided on affidavits without a hearing. Where such a hearing is ordered, it is because of certain unique situations, typically involving allegations of jury tampering, prosecutorial misconduct or third party confession. *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977).

Here, the motion is before the trial judge who is fully familiar with the record as it was developed at trial and with the material produced by the Government under the *Brady* order. *See United States v. Johnson, supra; United States v. Iannelli*, 528 F.2d 1290, 1294 (3d Cir. 1976). Affidavits have been submitted by Provenzano's attorneys and by Jeffrey Speiser and Robert C. Stewart for the Government. The Affidavits of Messrs. Goldberg and Shargel, the trial counsel, merely state that they never received the 302s of FBI Agents Smith and Sullivan. The Affidavit of Mr. Weissbard, Provenzano's present counsel, asserts that "defense counsel were totally unaware" of the escape complaint and outstanding arrest warrant which were not dismissed until 15 months after the escape. Weissbard Affidavit at ¶ 18. The Weissbard Affidavit further asserts, at ¶ 9:

> Mr. Goldberg has advised me that in his opinion these non-disclosed materials were extremely important and could have been used quite effectively by him. . . . if he had known of and been able to develop the additional material concerning the Florida trip the jury might very well have been convinced that the trip did not take place and that Picardo was not to be believed concerning defendant Provenzano's participation in the crime.[7]

rely entirely on Picardo's testimony about the Florida trip. For example, payments to the

The Affidavit of Mr. Speiser, the Government's trial counsel, asserts that he turned over the disputed 302s to defense counsel. He also states that a specific file of materials which he turned over to defense counsel was given to Assistant U.S. Attorney Nicholas Ackerman in the Southern District of New York. Ackerman was an attorney for the Government in the Tiari trial. Speiser asserts that Ackerman told him that all reports about Picardo which were turned over to the Tiari defense counsel were obtained from Speiser.

The Stewart Affidavit relates the account of filing the escape complaint and securing the arrest warrant for Picardo after he left the Maine facility. The Affidavit further states that Magistrate Hunt raised the matter of the outstanding warrant and complaint when Stewart was with him on an unrelated matter. Stewart asserts that he immediately arranged with Robertson to have the outstanding warrant and complaint dismissed. Stewart also states that he believes that (i) Picardo was never aware of the outstanding warrant and complaint, (ii) Speiser was never aware of the facts surrounding the outstanding warrant and the method by which it was dismissed, and (iii) "No one ever entertained any thought of prosecuting Mr. Picardo on the charges contained in that warrant after a declination of prosecution was issued following his arrest."

In addition to the above affidavits, the court has had the benefit of trial transcripts as well as documents produced for the trial of *United States v. Nunzio Provenzano*, Cr.No. 80–315 (D.N.J.), where Picardo testified about many of the same matters which impact upon his credibility. This court is confident that it has all the material and relevant evidence before it and that no further evidentiary hearing is necessary to decide the instant motion.

Rainbow's End Horse Farm by Picardo for upkeep of the horse of Provenzano's daughter, Doreen, were corroborated by the testimony of the horse farm owner. *See United States v. Provenzano, supra*, 620 F.2d at 1000.

## THE STANDARDS

Motions for a new trial based upon newly discovered evidence are addressed to the sound discretion of the trial court. *United States v. Iannelli, supra; United States v. Lombardozzi*, 343 F.2d 127, 128 (2d Cir.), *cert. denied*, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965). In *United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978), *cert. denied sub nom. LaDuca v. United States*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979), the Court of Appeals for the Third Circuit reaffirmed the five essential requisites of the so-called "Berry" test, or "probability" test which a defendant must meet prior to the grant of a new trial.[8] The *Rocco* Court held that the defendant "bears a heavy burden" of establishing that:

(a) the evidence must be in fact, newly discovered, i. e., discovered since the trial;

(b) facts must be alleged from which the court may infer diligence on the part of the movant;

(c) the evidence relied on, must not be merely cumulative or impeaching;

(d) it must be material to the issues involved; and

(e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

587 F.2d at 146.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held that where the prosecution's case included perjured testimony, and that the prosecution knew or should have known of the perjury, the undisclosed information is material if "there is a reasonable

8. The "Berry" test was first adopted by the Third Circuit in *United States v. Bertone*, 249 F.2d 156, 160 (3d Cir. 1957). *See also, United States v. Herman*, 614 F.2d 369 (3d Cir. 1980); *United States v. Iannelli, supra*, 528 F.2d at 1292–93; *United States v. Meyers*, 484 F.2d 113, 116 (3d Cir. 1973).

**410**

likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103, 96 S.Ct. at 2397. The *Agurs* Court further held that where a defendant has made a specific request for information and the prosecutor has failed to turn over that information, the test for materiality is whether "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398.

■ Provenzano urges that a new trial be granted because FBI Agent Smith committed perjury or purposefully attempted to create a false impression when he failed to disclose his investigation of the sporting goods store, about which information was contained in the allegedly missing 302. A close reading of the trial testimony, T2581–2601, reveals that Provenzano's counsel, Mr. Goldberg, began his direct examination by asking Smith whether he was asked to conduct a review of registration cards of the Americana Hotel in February 1976. T2582. That information was contained in a 302 report which all parties agree was produced in the *Brady* material. The entire Smith examination related to the February 1976 review of the registration cards. Defense counsel asked Smith if he ever went back to the Americana to do a further investigation after February 1976 until he left Miami in February 1978. T2598. Smith did not. T2599.

The problem is that the allegedly undisclosed 302 indicates that Smith made an investigation prior to the February 1976 review of the registration cards. When counsel asked whether he made a later investigation, he literally spoke the truth when he answered "No". T2598. Counsel suggested that if Smith was directed to go to the hotel and look for records other than registration cards for evidence of Provenzano and Picardo being there, that he would be compelled to do so, T2594, and Smith agreed. However, counsel never followed up that suggestion to ask Smith if he had

ever made any investigation other than the registration cards. Smith was called as a defense witness. Whether counsel interviewed him prior to his testimony is unknown. If they did, perhaps they had some reason for not pursuing that line of questions.[9] If they did not, hindsight indicates perhaps they should have.

The Speiser Affidavit asserts that the Smith 302 was provided to counsel with the other *Brady* material. Assuming, *arguendo,* that it was not produced, in light of the voluminous documents containing material which could be used to impeach Picardo that were produced, any non-disclosure was clearly inadvertent. Agent Smith had no motive to testify falsely. He had to assume that his 302 of the earlier investigation of the sporting goods store was provided to counsel and, if they had any questions about that investigation he would be examined about it. To allege that Agent Smith was purposefully attempting to mislead counsel and the jury by withholding information about the earlier investigation, when he was never asked about it, and to expect him to volunteer information beyond the scope of the question, is to urge an unwarranted extension of due process principles and infringe upon the fundamental nature of the adversary system. *Cf. United States v. Iverson,* 637 F.2d 799, 806 (D.C. Cir.1980) (Tamm, J., dissenting).

■ Smith certainly testified within the letter of the truth. *See United States v. Lasky,* 548 F.2d 835, 839 (9th Cir.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977). His testimony clearly does not rise to the level of perjury as Provenzano contends. In *Bronston v. United States,* 409 U.S. 352, 360, 93 S.Ct. 595, 600, 34 L.Ed.2d 568 (1973), the Supreme Court held that the perjury statute, 18 U.S.C. § 1621,

is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the ques-

9. Counsel were aware of information which corroborated Picardo's testimony about the Florida trip. Stephen Andretta appeared before a grand jury in Michigan and gave testimony about a trip he took with Picardo to Miami

in late 1973 where he had certain conversations with Provenzano. The transcript of that grand jury testimony was provided to counsel as part of the Government's pretrial compliance with the court's *Brady* order.

tioner—so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. (citations omitted).[10] Here, the specific object of inquiry was the effort made by the FBI to verify Picardo's alleged trip to Florida. Four highly skilled defense attorneys cross-examined Smith. Other questions could have been asked; they never were.

■ Assuming that counsel had elicited testimony about the earlier investigation by Agent Smith, would it have revealed material information? The allegedly undisclosed 302 contains totally inconclusive information on the issue whether Picardo bought clothing at the sporting goods store—many receipts were for cash and contained no names. Likewise the allegedly undisclosed 302 of Agent Sullivan is inconclusive as to airline reservations. The strongest argument that the defendants had to impeach Picardo about the Florida trip was the review of the reservation cards, particularly in light of Picardo's testimony that Provenzano was registered as a guest. T593. Defense counsel examined and cross-examined Smith repeatedly about that investigation. Any information derived from the allegedly undisclosed 302s would have been merely repetitious and cumulative, if any inference could be drawn from them at all, on the issue of the FBI's failure to verify the Florida trip. A conviction need not be vacated because such evidence has not been revealed to the defendant. *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730, 735 (3d Cir. 1978). Moreover, in summation, Provenzano's counsel noted the fact that the Government failed to verify the Florida trip through any airline records. It seems clear that under either *Agurs* standard of materiality, the allegedly undisclosed 302s contained information which would have had no effect on the outcome of the trial.

10. *See also*, Anno. "Incomplete, misleading or unresponsive but literally true statement as perjury," 69 A.L.R.3d 993 (1976).

11. Picardo testified in this district in *United States v. Nunzio Provenzano*, Cr.No. 80–315 (D.N.J.) on March 24, 1981 that, as of April

■ As for the alleged failure to provide counsel with the Clerk's docket sheet and Magistrate's documents relating to the escape complaint and arrest warrant, Provenzano's argument is specious. Picardo was in Government custody pursuant to a Writ of Habeas Corpus Ad Testificandum issued by this court in November 1975 compelling him to appear before a grand jury in this district. He was temporarily confined in Bangor, Maine pending completion of his testimony before the grand jury. Arguably, Picardo's escape could be prosecuted in either the district where the offense occurred, Maine, *see* U.S.Const. Art. III, § 2, cl. 3; 18 U.S.C. § 3231; Fed.R.Crim.P. 18; *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958), or in the District of New Jersey from where the Writ issued.

The United States Attorney in the District of Maine declined prosecution 48 days after the incident. This information was provided to defense counsel with the *Brady* material. Moreover, even if Picardo knew of the outstanding District of New Jersey warrant and complaint before it was dismissed, no prejudice could inure to Provenzano because the dismissal occurred approximately 14 months *prior* to Provenzano's trial, thereby giving Picardo no motive to testify falsely due to the threat of prosecution for escape.[11] Defense counsel had the FBI 302s detailing the escape. Both Agents Cummings and Bergholtz testified that Picardo had escaped and was arrested pursuant to a warrant, T2572–2581; T2651–2662. It seems quite clear that any material information about the escape was provided prior to trial, and the allegedly undisclosed docket sheet and magistrate's documents reveal information which could have had no effect on the outcome of the trial.

■ Provenzano contends that Picardo committed perjury when he testified as follows:

1977, the time he was granted bail in Hudson County, he did not know whether a federal escape charge had been filed against him. T4.80. By that date, of course, prosecution had been declined in Maine.

Q. [by Mr. Goldberg] Is it not a fair statement that it is your hope that you'll never have to stand trial for that murder case?

A. That's correct, sir.

T655. This testimony is contradicted, urges Provenzano, by Picardo's testimony in the Tiari trial:

Q. [by the Government attorney] In connection with that cooperation [with the State of New Jersey], do you have an understanding with respect to your retrial on the murder charge?

A. Yes, I do.

Q. What is your understanding?

A. That I won't be retried again.

T1662. Supplemental Brief of Defendant in Support of Motion at 2. There was colloquy between Picardo and the court in the Tiari trial:

The Court: I think the question is at this time [April '77] did you believe that if your appeal was successful and even if in terms the higher court ordered a retrial did you understand that in fact you were not going to be retried?

The Witness: The answer to that, sir, is yes.

If Picardo committed perjury, Provenzano contends that a new trial is warranted under the rule of *Larrison v. United States*, 24 F.2d 82, 87 (7th Cir. 1928), and that the five-part newly discovered evidence standard does not govern in situations involving perjury by a key prosecution witness. The *Larrison* Rule holds that a new trial should be granted when

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial.

*Id.* at 87–88 (emphasis in the original).[12] The *Larrison* Rule has been recognized by the Third Circuit in *United States v. Meyers*, 484 F.2d 113 (3d Cir. 1973). But in *Meyers* the court held that the conduct of the witness was so egregious that a new trial was warranted under that standard *or* the so-called "Berry" or "probability" test. *Id.* at 117. No case in this circuit has expressly granted a new trial under the *Larrison* Rule.

The *Larrison* Rule, or "possibility" test, recently has been criticized by both the Second Circuit, *United States v. Stofsky*, 527 F.2d 237, 245–46 (2d Cir. 1975), *cert. denied, Hoff v. U.S.*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976), and the Ninth Circuit, *United States v. Krasny*, 607 F.2d 840, 846 (9th Cir. 1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980). Both *Stofsky* and *Krasny* opt for the probability standard rather than the *Larrison* Rule, even when the testimony is shown to have been perjured. *See Krasny*, 607 F.2d at 844–45, where the court held "the probability standard is appropriate for determining whether perjury requires a new trial, . . . at least when the government did not knowingly or negligently use the perjured testimony." (Citations omitted.)

This court must decide (i) whether Picardo's testimony on this issue was perjured, and (ii) if so, whether to apply the *Larrison* Rule or the probability standard.

There is no doubt of the fact that prior to the reversal of Picardo's murder conviction in 1977, two Deputy Attorneys General of the State of New Jersey questioned him in the presence of a federal agent while Picardo was incarcerated in federal custody in San Diego. The summary of that interrogation was included in the *Brady* material provided to defense counsel prior to Provenzano's trial. It contained information to the effect that Picardo was told by the Deputy Attorneys General that if he were

12. It is clear that the test is conjunctive, and that a finding of inability to meet any part would preclude its imposition.

granted a reversal, it was unlikely he would be retried. Provenzano's counsel questioned Picardo directly about his meeting in San Diego. T655–656. Picardo testified that he hoped that he would not be retried.

The fact that Picardo testified later, in the Tiari trial, that he had an agreement with New Jersey not to be retried does not compel the conclusion that he lied in the instant case. Nor is that conclusion compelled by Picardo's earlier testimony at Provenzano's trial in Ulster County, New York, where Provenzano was convicted of murder.[13] According to incomplete transcripts provided to the court by Provenzano's attorney after the hearing on the instant motion, Picardo testified that he was "awaiting retrial" of his Hudson County murder charge. *People v. Provenzano*, T434, June 5, 1978.

That statement in the Ulster County trial, that Picardo was "awaiting retrial" in New Jersey, was literally true despite what Picardo might have understood to be the assertions of the New Jersey Deputy Attorney General who interviewed him in San Diego in 1977. The State of New Jersey intends to retry Picardo in Hudson County. *See* transcript of hearing before the Hon. Thomas O'Brien, J.S.C., in Superior Court, Hudson County in *State v. Picardo*, Ind.No. 1153–73 at 44, marked for identification in the trial of *United States v. Nunzio Provenzano*, Cr.No. 80–315 (D.N.J.), transcript of April 15, 1981 at 19.95. On August 31, 1981, this court was advised by Judge O'Brien that an attempt to move the retrial was made in July 1981, but due to a shortage of judges at that time it was rescheduled and should proceed in September 1981.

Unless Picardo is a fool, which this court is absolutely certain he is not, he was telling the truth here when he testified that he "hoped" not to be retried. Logic would be tortured beyond recognition to conclude differently; no one hopes to be retried for murder. In fact, Picardo testified under cross-examination by Mr. Goldberg: "I don't think anybody in his right mind would want to [stand trial for murder again]." T493.

In testifying later, in the Tiari trial, that he had an understanding that he would not be retried, Picardo, at worst, misunderstood the assertions of the Deputy Attorney General in San Diego—more likely, he accurately answered the question which focused on the period prior to the reversal of his conviction.

At oral argument on the instant motion, the Government conceded that it had an obligation to come forward and reveal that Picardo had an understanding with the State of New Jersey not to be retried, *if* it had knowledge that such an agreement existed. The attorneys for the Government have maintained from the outset of this prosecution that they were unclear as to what understandings or agreements, if any, Picardo may have had with the State of New Jersey. They made their confusion crystal clear to defense counsel prior to trial in this matter. This court has no reason to doubt the truth of the Government's assertions. *See* transcript of the hearing on the instant motion, T54–T58 (May 11, 1981).

---

**13.** That conviction was reversed and a new trial was granted by the New York Supreme Court, Appellate Division, approximately two weeks after Provenzano's trial here. *People v. Provenzano*, 417 N.Y.S.2d 317, 70 A.D.2d 960 (1979). Provenzano had been represented at trial in that case by Maurice Edelbaum, Esq., one of his attorneys on the instant motion. On appeal, Provenzano was represented by Jay Goldberg, Esq. and Gerald Shargel, Esq., who represented him at trial in this case, as well as by John Pollok, Esq., trial attorney here for codefendant, Thomas Andretta.

After the reversal, the New York Court of Appeals granted the prosecution's request for review and, in turn, reversed the Appellate Di-

vision. *People v. Provenzano*, 50 N.Y.2d 420, 429 N.Y.S.2d 562, 407 N.E.2d 408 (Ct.App. 1980). Provenzano was represented at the Court of Appeals by Edelbaum, Goldberg, Shargel and Pollok. The case was remanded to the Appellate Division for consideration of Provenzano's arguments which had not been reached previously. On remand, the Appellate Division affirmed the conviction of Provenzano, *People v. Provenzano*, 79 A.D.2d 811, 435 N.Y.S.2d 369, 371 (1980). He was represented on remand by Edelbaum, Shargel and Pollok. The New York Court of Appeals seemingly has ended the litigation by denying Provenzano's petition for certiorari on April 10, 1981.

What is vitally important is that the Government provided in the *Brady* material the summary of the meeting between Picardo and the New Jersey Deputy Attorneys General. That summary, designated J–80–W, sets forth the names of the interviewers —Hall, a member of the New Jersey State Police Intelligence Bureau, and Bozza, a Deputy New Jersey Attorney General—as well as the fact that FBI Special Agent James Kosler was present. The summary, drafted by Hall, states in pertinent part:

The case concerning Trombetta [victim of the Hudson County murder] is currently in the appeal courts. According to Picardi's [*sic*] Attorneys, FBI sources and DAGs Palleria and Bozza, Picardi [*sic*] will probably win the appeal and there is a good possibility that he would not stand trial again.

Provenzano's counsel had this information long before trial; it is certainly not newly discovered. It is well settled that evidence is not newly discovered when it was known or could have been known by the diligence of the defendant or his counsel. *United States v. Provenzano, supra,* 620 F.2d at 997; *United States v. Bujese,* 371 F.2d 120, 125 (3d Cir. 1967).

If, indeed, as Provenzano now asserts, the information conflicted with Picardo's earlier testimony in Ulster County, Provenzano's counsel had the opportunity prior to the instant trial to seek out those state and federal government agents referred to in the summary—Hall, Bozza, Palleria and Kosler—and determine if there was a deal with the State of New Jersey. This court is unaware of any efforts by defense counsel to interview these government agents; certainly none were called as witnesses. These deliberate tactical decisions by counsel are binding on the defendants, *United States v. Provenzano, supra,* 620 F.2d at 997; *see also United States v. Hoffer,* 423 F.Supp. 811, 817 (S.D.N.Y.1976), *aff'd mem.,* 556 F.2d 561 (2d Cir. 1977), and the failure to pursue the issue may well constitute a waiver by the defendants to allege any error based upon the missed opportunity. *See United States v. Harris,* 498 F.2d 1164, 1170 (3d Cir. 1974).

Moreover, Picardo's arrangements about retrial, if such ever existed, could not be affected by how he testified in Provenzano's trial here, because his agreement with the federal government, which was completely disclosed to counsel, did not impact on the retrial—only upon his possible parole or clemency if he were convicted anew. T415–416.

It is quite clear that Picardo's response, "That's correct, sir.", to Mr. Goldberg's question, "Is it not a fair statement that it is your hope that you'll never have to stand trial for that murder case?", T655, was a literally truthful statement. *See Bronston v. United States, supra.* It is most interesting that the word "hope" was not chosen by the witness, but by Provenzano's counsel. Likewise, in the Tiari trial, the word "understanding" was not chosen by the witness, but by the government attorney.

In any event, if the statement in response to Mr. Goldberg's question in this case was not truthful, there is no reason for the court to believe that the prosecution had any knowledge of its falsity. On the contrary, the Government has asserted from the outset, and Picardo has so testified, that there has been no federal interference with a scheduled retrial, *see* transcript of trial of *United States v. Nunzio Provenzano,* T2.63 (March 20, 1981), and that if he had any "agreement", it was with the State of New Jersey, *id.* at T4.98.

■ This court finds that Picardo's statement that he "hoped" not to be retried was a true statement. Without a finding that the statement of the witness was false, the *Larrison* Rule does not become effective. At best, Provenzano must abide by the probability test if the statement in the Tiari trial can be considered newly discovered, because the statement only can be used to impeach Picardo. *See United States v. Gabriel,* 597 F.2d 95, 99 (7th Cir. 1979).

■ Provenzano contends that the statement could be used to impeach Picardo. The general rule on motions for a new trial as to newly discovered evidence which

reveals *untrue* statements by a Government witness, is that new evidence which is merely cumulative or impeaching is not an adequate basis for the grant of a new trial. *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). Furthermore, the Supreme Court has refused to hold that any subsequently discovered *inaccuracy* in the testimony of an important trial witness, which might have affected his credibility in the eyes of the jury, would entitle a convicted defendant to a new trial. *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 357, 83 S.Ct. 448, 458, 9 L.Ed.2d 357 (1963).

█ The disputed statement was a tiny part of an extensive cross-examination which vigorously and exhaustively attacked Picardo's credibility. Picardo testified to falsifying documents, using drugs, gambling, philandering, cheating on his taxes, and a willingness to do virtually anything to protect himself. The alleged inconsistency in his testimony "pales into total insignificance as impeachment when considered against a backdrop of all the other impeaching evidence the jury had before it." *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979). Moreover, the jury was instructed to receive Picardo's testimony with caution. Jury charge at 21–23. *See United States v. Runge*, 593 F.2d 66, 74 (8th Cir.), *cert. denied*, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). There is no possible way to conclude that at a new trial, evidence of the newly discovered "inconsistent statement" would probably produce an acquittal. *See United States v. Davila*, 428 F.2d 465, 466–67 (9th Cir. 1970).

## CONCLUSION

The defendants have been speedily and publicly tried. They were convicted. By continually shifting focus, Provenzano has successively attacked his bail status pending appeal and his conviction on multiple legal theories. He has twice sought recusal of the trial judge. He has cast aspersions on the considerable abilities of his trial counsel, and he has attempted to interject wild speculation about personal vendettas against him by the Government relating to investigations far removed from this matter. *See* transcript of the hearing on the instant motion.[14] These types of attacks sometimes continue for years.[15]

With the realization that this opinion now becomes the basis for yet continued appellate review, this court concludes that the allegation that Agent Smith perjured himself in not divulging the investigation of the sporting goods store receipts is unsupported by the law. Likewise unsupportable by the law, as well as the facts, is Picardo's alleged perjury in making a statement in the Tiari trial regarding his retrial, allegedly inconsistent with the statements made in this case. The information contained in the allegedly undisclosed 302s, and in the District of New Jersey documents relating to Picardo's escape in Maine, is wholly inconclusive at best, and is merely cumulative to other, much stronger, impeachment testimony in the record.

There is no indication that the Government attorneys withheld any information from defense counsel which was "material" to the issues under any tier of the *Agurs* standard. Although Provenzano alleges multiple non-disclosures of information which he specifically requested, *see DeMartino v. Weidenburner*, 616 F.2d 708, 713–14 (3d Cir. 1980), it is clear to this court that none of the information allegedly non-disclosed would have had any effect on the outcome of the trial, nor is there a reasonable likelihood that the verdict would have been different. Provenzano has not met his "heavy burden", *United States v. Rocco*, *supra*, 587 F.2d at 146.

14. In an attempt to determine if this motion was the final chapter in this continuing drama, the court inquired of Provenzano's attorney whether there were any further post-conviction motions contemplated. The answer was equivocal. Transcript at 74.

15. *See United States v. Provenzano*, Cr.No. 429–60 (D.N.J.), where examination of the Clerk's docket reveals that seven years elapsed between indictment and final affirmance by the appellate courts. Four of those years were after the conviction.

**416**

As Justice Jackson stated in *Stein v. New York*, 346 U.S. 156, 197, 73 S.Ct. 1077, 1099, 97 L.Ed. 1522 (1953), "The petitioners have had a fair trial and fair review. The people . . . are also entitled to due process of law." The motions for a new trial are denied. The Government shall submit an appropriate order.